Pittsburgh, Appellant, *v.* Pennsylvania Public
Utility Commission.

Argued June 16, 1966. Before ERVIN, P. J., WRIGHT, WATKINS, MONTGOMERY, JACOBS, HOFFMAN, and SPAULDING, JJ.

*W. Russel Hoerner,* with him *Paul H. Rhoads, J. M. Noel, William Anderson,* and *Rhoads, Sinon & Reader,* for utility company.

*Albert D. Brandon,* Assistant City Solicitor, with him *David Stahl,* City Solicitor, for City of Pittsburgh.

*Robert E. Jamison,* for protestants.

*Robert L. Orr,* with him *Harold F. Reed, Jr.,* for protestants.

*Robert M. Harris,* Assistant Counsel, with him *Joseph C. Bruno,* Chief Counsel, for Public Utility Commission.

OPINION BY ERVIN, P. J., September 15, 1966:

This rate proceeding began when Columbia Gas of Pennsylvania, Inc. filed tariffs increasing Columbia's gross revenue by some $6.5 million or about 9%. Complaints against the proposed increase were filed by the commission, the City of Pittsburgh, County of Allegheny, Borough of Ambridge, Borough of Canonsburg and eleven industrial consumers. The commission suspended the proposed rates for a period of nine months (July 28, 1964 to April 28, 1965). Further, the commission provided that the existing rates should continue in effect after April 28, 1965 as temporary rates, under §310 of the Public Utility Law, subject to recoupment on final order.

By final order dated October 4, 1965 the commission granted an increase in allowable operating revenues of $5,085,466, or more than 75% of the increase sought. The commission found a fair return of $5,-917,000 based on a fair rate of 6.1%, on a fair value finding of $97 million.

Appeals to this Court from the commission order of October 4, 1965 were taken by Columbia, the City of Pittsburgh and ten of the eleven industrial complainants. Columbia was permitted to intervene as appellee in the appeals of the city and the industrial companies. All appeals have been consolidated for argument and will be disposed of in one opinion.

In general, Columbia contends that the commission's finding of (1) fair value, and (2) rate of return is too low, and (3) that the exclusion of certain operating expenses makes the allowance for that item too low. By contrast, the city and industrial complainants contend the findings of the commission on fair value, rate of return and allowable operating revenues, are excessively high.

FAIR VALUE: ORIGINAL COST. The commission accepted Columbia's claim of $93,729,608 for undepreciated original cost. The city alleges there is no evidence showing original cost of Columbia's property on the record. Columbia was "spun off" from Manufacturers Heat and Light Company pursuant to a realignment order of the commission dated September 12, 1961. Complainants did not raise any question concerning original cost before the commission, or in their appeal petitions, and ordinarily cannot raise such question on appeal. Cf. *George Hyam Associates, Inc. v. Pa. P.U.C.,* 199 Pa. Superior Ct. 3, 184 A. 2d 414 (1962).

Under the Uniform System of Accounts, original cost figures for Manufacturers, the parent company, were recorded, and approved by commission orders dated December 30, 1946 and February 21, 1955. Original cost figures for the parent company were produced in two rate cases. See *Pa. P.U.C. v. Manufacturers Light and Heat Co.,* 35 Pa. P.U.C. 727, 740 (1958), and 37 Pa. P.U.C. 345, 354 (1959), and *Pittsburgh v. Pa. P.U.C.,* 187 Pa. Superior Ct. 341, 144 A. 2d 648 (1958). Thus the property of Manufacturers, the par-

ent company, used in furnishing gas service in Pennsylvania, was recorded at original cost prior to the transfer to Columbia. Further, on September 12, 1961 the commission entered a detailed order approving realignment and transfer. Pittsburgh contends that some $17 million of transmission mains were improperly reclassified by Manufacturers as distribution mains, and transferred in the realignment proceedings to Columbia. The implication is that the "reclassification" was made to wrongfully increase the property transferred to Columbia as part of its rate base. However, there is no showing, as the city contends, that transmission mains of Manufacturers were wrongfully included in the original cost, or wrongfully entered into the fair value finding of Columbia's property. Columbia presented an original cost figure and many exhibits dealing with original cost of its property in this proceeding. Exhibit 9 showed net depreciated original cost of plant in service as of March 31, 1964 as $73,801,438, or $93,-732,200 undepreciated. The realignment proceeding of September 12, 1961 expressly provided that it did not bind the commission on the question of valuation in a subsequent rate case. However, the realignment proceeding did disclose original cost figures, less reserve, for depreciation, depletion and amortization, and to which was added other current assets, making a total of $82,526,579.

Property installed by Columbia since the transfer of 1961 has been recorded at original cost pursuant to the Uniform System of Accounts. The commission decided, in the realignment proceeding of September 12, 1961, that the transfer between Manufacturers and Columbia was proper. Cf. *Berner v. Pa. P.U.C.*, 382 Pa. 622, 116 A. 2d 738 (1955). While the realignment is not conclusive on the question of the valuation of Columbia's property in a rate case, it does furnish substantial evidence on this question.

Columbia properly points out that reclassification does not change the dollar value of the property. The commission in the 1961 realignment proceeding held the reclassification of property by Manufacturers in 1959 was lawful, and that the property transferred to Columbia was properly part of Columbia's system. So, the reclassification by Columbia in 1963 of gas mains from transmission (Acct. 367) to Distribution (Acct. 376) had no effect on the original cost of Columbia's property.

TRENDED ORIGINAL COST. Columbia offered five measures of value, viz., undepreciated original cost $93,-729,608 and estimates of trended original cost at one year average price level ($170,465,297) undepreciated; two-year average price level ($169,033,863) and three-year average price level ($167,605,345) and five-year average price level ($164,705,485). The commission criticized Columbia's trended original cost study, stating: "Respondent's trended original cost study lacked much of the detail necessary to fully check the applicability of the trending data employed." The commission made detailed analysis and criticism of Columbia's trend factors, including trend factors for the contract labor component, equipment component and cost of pipe. The city complains that the commission gave great weight to the trended original cost studies instead of making adjustments downward because of their frailty. Columbia, on the other hand, claims that the commission's criticism of Columbia's trending procedures is not justified or warranted by the evidence. The commission noted that Columbia's actual cost experience for the years 1959-63, as shown by Columbia's exhibit No. 116, applied to total distribution pipe, exceeded trended original cost at the 1963 level by about $37,000,000 and stated that this showed "to some extent the reasonableness of respondent's five-year estimates." The city says the unit costs of 1963 are not

representative of the cost of reproducing the whole plant.

The commission noted that no adjustments had been made in the indexes to reflect change in dollar values or change in labor productivity or use of modern equipment, that is, no "supersession discount." "Supersession discount" is the effect of the development of new materials, designs and methods of construction which have superseded older methods or materials, resulting in an increased efficiency, and means that a product costing more than the one it replaces requires a discount because it is more efficient than the article replaced. The commission rejected any claims for "supersession discount" on the ground that such matters were indefinite, theoretical and incapable of exact mathematical calculation. *Application of Wilmington Suburban Water Corporation etc.,* (Del., June 14, 1965), 211 A. 2d 602.

In essence, Columbia claims that the commission did not give proper weight to Columbia's measures of value, which were conservative, free from error, and would warrant a fair value finding in excess of $100 million. On the other hand, complainants allege that the commission, while properly criticizing *trended* original cost, gave undue weight thereto in fixing a fair value of $97 million. Here the commission gave Columbia's trended cost estimates thorough investigation and consideration. The commission's analysis of the city's and Columbia's contentions regarding the trended original cost was not shown to have been erroneous as a matter of law. The commission's criticism of trended cost estimates dealt largely with matters of opinion, the interpretation of evidence, and the weight to be given such evidence. "The weight to be given to the established measures of value was a matter for the commission if its discretionary power was not capriciously exercised. Ordinarily, a finding of fair value should not be mere-

ly a mathematical average, but should display an exercise of well-founded judgment. In the absence of an error of law, an abuse of discretion, or any indication of caprice, we shall not disturb the finding of fair value." *Riverton Consolidated Water Co. v. Pa. P.U.C.*, 186 Pa. Superior Ct. 1, 12, 140 A. 2d 114, 120. The commission is not bound by any formula in fixing a rate base, all factors having a bearing on fair value, as that term is used in rate proceedings, should be considered: *Pittsburgh v. Pa. P.U.C.*, supra, 187 Pa. Superior Ct. 341, 349. The weight factor given trended original cost used by the commission in fixing fair value is not out of line with the average of all measures submitted: Cf. *Johnstown v. Pa. P.U.C.*, 184 Pa. Superior Ct. 56, 133 A. 2d 246 (1957). The commission's finding of a fair value of $97 million is supported by evidence, free from error of law or abuse of discretion and will not be disturbed.

ACCRUED DEPRECIATION. The city contends the commission should use Columbia's book reserve for accrued depreciation instead of the depreciation reserve as calculated under Columbia's reserve requirement study. On original cost the excess of book reserve was $4,-304,249. The commission rejected the city's contention that the remainder life theory should be applied to annual and accrued depreciation. We affirmed the commission in rejecting the remainder life theory in *Pittsburgh v. Pa. P.U.C.*, 178 Pa. Superior Ct. 46, 112 A. 2d 826 (1955), stating at page 59: "Whether the remainder life theory shall be applied in any given case, and the extent of its application are primarily matters for the commission. Expressed in another way, the relative weight to be given any particular evidence on depreciation is, under ordinary circumstances, for the commission. Thus the relative weight to be accorded book reserve and a reserve requirement study would be for the commission as the trier of fact. The question,

whether an apparent 'excess' or 'deficiency' in the book reserve is genuine, is subsidiary to the main problem of credibility of evidence."

The city also contends that the commission's finding of accrued depreciation for rate purposes in an amount less than the book reserve amounts to a confiscation of the contributions of the ratepayers without due process of law. The same proposition was advanced by the city in *Pittsburgh v. Pa. P.U.C.*, supra, 187 Pa. Superior Ct. 341, 353, 356, 144 A. 2d 648, and rejected by this Court, stating: "To have validity this contention must be based upon a factual finding that the excess of the book reserve over the reserve requirement was a genuine one in the sense that it had been contributed by the ratepayers over the years in addition to providing the utility with a fair return. . . .

"Since the book reserve for depreciation and depletion was unreliable, having been accrued regardless of earnings, the disregard of the excess of the book reserve over the computation of the reserve requirement study was not a confiscation of any property of the ratepayers or a deprivation of their property without due process of law. The excess in fact was not genuine." The commission treated negative salvage, as directed in *Penn Sheraton Hotel v. Pa. P.U.C.*, 198 Pa. Superior Ct. 618, 184 A. 2d 324, as a separate allowable revenue deduction to be amortized over a period of years.

Annual depreciation charge is, of course, an important expense item. Here the commission allowed annual depreciation expense in the amount of $1,779,730, based on the utilities reserve requirement study. Thus the commission followed the rule that annual depreciation expense and accrued depreciation should be calculated on a reasonably consistent basis: *Philadelphia v. Pa. P.U.C.*, 174 Pa. Superior Ct. 641, 655, 102 A. 2d

428 (1954); *City of Pittsburgh v. Pa. P.U.C.,* 171 Pa. Superior Ct. 187, 213, 90 A. 2d 607 (1952).

The commission criticized in some detail the depreciation study presented by Columbia to establish accrued depreciation on the various measures of value. Columbia's reserve requirement study was based on the group average life, straight line method. Annual accruals were calculated on the basis of average service life group straight line depreciation. By way of criticism the commission stated: "There are three areas in the depreciation reserve study which in our opinion do not reflect sound depreciation practices. They are (1) the use of an inappropriate experience band, (2) the application of survivor curves to property where the interim retirements do not reflect final retirement, (3) the application of survivor curves to property where the retirement data are insufficient to develop a representative curve." (1) The commission held that the heavier retirement experience of more recent years would be more accurately shown by a 13-year experience band than by the 24-year band used by Columbia's consultants. (2) The commission also stated that certain types of property, viz., buildings, should not be depreciated by the use of survivor curves but the use of such curves should be restricted to "mass property accounts." (3) The commission stated that the plot points used to develop the survivor curve for the liquified petroleum gas plant and other property, were inadequate. In conclusion the commission stated: "Recognizing the inherent difficulty in computing the dollar effect of the foregoing criticisms, respondent's claim of $14,582,614 for the calculated depreciation reserve on original cost will be given appropriate consideration in our determination of fair value."

The commission's criticism of the reserve requirement study related chiefly to the weight to be given the study. The commission's discussion of depreciation

shows that it considered all relevant factors in connection with accrued depreciation. It is recognized that accrued depreciation is essentially a judgment figure, based on all the evidence, and the weight to be given any particular estimate is for the commission: *Phila. v. Pa. P.U.C.*, supra, 174 Pa. Superior Ct. 641, 102 A. 2d 428, and cases cited at pages 649, 650; *Blue Mountain T. & T. Co. v. Pa. P.U.C.*, 165 Pa. Superior Ct. 320, 324, 67 A. 2d 441 (1949). The commission is not bound to accept any particular method of estimating accrued depreciation: *Orlosky v. Pa. P.U.C.*, 171 Pa. Superior Ct. 409, 89 A. 2d 903 (1952); *Pittsburgh v. Pa. P.U.C.*, supra, 171 Pa. Superior Ct. 187, 90 A. 2d 607.

INVESTMENT TAX CREDIT. Under the Revenue Act of 1962 the utility is authorized to deduct from Federal income taxes an amount equal to 3% of the cost of certain types of property installed subsequent to January 1, 1962. According to the commission's accounting rules the utility records the investment tax credit in a separate account, to be amortized over the depreciable life of the property to which the credit applies. As of March 31, 1964 there existed a credit balance of $352,-496, being the unamortized amount of the investment tax credit applicable to property installed after January 1, 1962. In its order, the commission treated the investment tax credit as follows: 1. The unamortized balance of the experienced investment tax credit, as applied to property installed since 1962, was deducted from each measure of value. These deductions ranged from $342,637 to $355,282. 2. The annual amortization of the investment tax credit, to March 31, 1964, as computed by Columbia, totalling $13,929, was deducted from computed income taxes, when determining allowable income taxes, as an expense item, for the base year. In so ruling the commission rejected complainant's contention that Columbia's "trended original cost

measures of value should be reduced to the extent [viz., $3,300,000] of the investment tax credit that would" be applicable if all Columbia's plant had been installed since January 1, 1962. The commission followed its ruling in York Telephone and Telegraph Co. (C.17086) and Equitable Gas Co. (C.17984), that only the investment tax credit actually accumulated should be deducted from each measure of value. Under complainants' contention both the hypothetical tax credit of $3,300,000 and accrued depreciation of $49,263,099 would be deducted from trended original cost. The commission noted that the tax law in question was not in effect prior to 1962 and contained limits as to the amount of investment tax credit which could be obtained in any one year. We think the commission acted within its power in rejecting application of the investment tax credit to trended original cost of the entire plant, as too speculative.

The commission also rejected complainants' contention that the full amount of the investment tax credit as earned in each year, should be deducted from the year's income tax liability. Thus, the investment tax credit for 1962 was $150,400, for 1963 $170,125, and $39,745 to March 31 of 1964. Instead, the commission, as stated, ruled that only Columbia's claim for annual amortization of the investment tax credit (here $13,-929) should be deducted from income tax expense for the base year.

Columbia contends that the commission's deductions of the unamortized balance of the investment tax credit (roughly, some $352,496) from the utility's rate base, is contrary to the intent of Congress and deprives the utility of the benefit of the tax laws. It is clear, as the commission argues, that the investment tax credit is calculated directly from the cost of the newly installed property. The commission treated the credit, therefore, as a reduction in the cost of the property

and deducted the unamortized portion thereof from the original and trended cost measures of value. Section 203(e) of the Revenue Act of 1964 states that Federal regulatory agencies shall not (without the consent of the taxpayer) "use . . . more than a proportionate part . . . of the credit against tax allowed for any taxable year . . . to reduce such taxpayer's Federal income taxes for the purpose of establishing the cost of service of the taxpayer or to accomplish a similar result by any other method." Admittedly, the Federal Tax Act does not govern state regulatory agencies in determining fair value, or income tax allowances. The commission has discretion to make such adjustments to cost estimates as are warranted by the evidence: *Pittsburgh v. Pa. P.U.C.*, supra, 187 Pa. Superior Ct. 341, 361, 144 A. 2d 648. We find no abuse of discretion or error of law in the commission's treatment of the utility's investment tax credit.

ADJUSTMENTS TO BASE YEAR. The test year in the present case covered the twelve-month period beginning April 1, 1963 and ending March 31, 1964. Complainants attack two adjustments made to the test year figures by the commission, namely (1) a tax rate of 50% and the sum of $137,295 representing wage increases of May 1, 1963 and May 1, 1964. Complainants argued for a tax rate of 48% which became effective January 1, 1965, or nine months after the end of the test year. The tax rate was changed from 52% to 50%, effective January 1, 1964, three months prior to the end of the test year. Under these circumstances the commission found that the 50% rate was to be used in computing Columbia's income tax liability. Regarding the adjustment for wage increases the commission stated: "Respondent claims $137,295 for annualization of wage increases of May 1, 1963 and May 1, 1964, which resulted from negotiations with unions representing respondent's employees, and increases in gen-

eral office and executive salaries." Complainants say the commission should either reduce the allowance to reflect the known change in tax rates to 48%, or, in the alternative, refuse to allow the May 1964 wage increases occurring after the base years. Here pertinent is the following statement by Judge WRIGHT in *Duquesne Light Co. v. Pa. P.U.C.*, 176 Pa. Superior Ct. 568, 107 A. 2d 745: "We recognize that, in practical application, the use of a test year and cut-off date in determining a rate case is not free from difficulty, since changes may become known before the order is entered. In strict theory perhaps, these subsequent developments should be ignored. However, this court has stated that the Commission 'cannot be oblivious' to them." Adjustments concerning matters occurring after the test year are, to a very large extent, within the discretion of the commission: *Pittsburgh v. Pa. P.U.C.*, supra, 187 Pa. Superior Ct. 341, 144 A. 2d 648. Although a tax rate of 52% was in effect during the first nine months of the test year, the commission adopted the 50% tax rate which was in effect during the final three months. The allowance of the wage increase of May 1, 1964, was a balancing factor. We perceive no inconsistency or abuse of discretion in the adjustments made by the commission.

INCOME TAX: ACCELERATED DEPRECIATION. Columbia used straight line depreciation in computing depreciation for income tax purposes, and this was accepted by the commission. Complainants aver that it was an abuse of managerial discretion to use the straight line method of depreciation; that the commission should reduce the utility's income tax allowance as though it had used accelerated depreciation available to it under the income tax laws (§167 of the 1954 Int. Rev. Code, 26 U.S.C.A. 167). It is established in this Commonwealth that the use of any permissible method of computing income taxes is within the discretion of the

utility management: *Pittsburgh v. Pa. P.U.C.*, 182 Pa. Superior Ct. 551, 577, 128 A. 2d 372, 384. However, the commission exercises control over the amount allowed the utility for rate purposes. In *Pittsburgh v. Pa. P.U.C.*, supra, 187 Pa. Superior Ct. 341, 359, 360, we affirmed the commission in allowing the utility to use straight line depreciation for income tax purposes, and refusing to require the utility to compute its tax for rate purposes, as though it had used accelerated depreciation, stating: "It is established in this Commonwealth that one of the costs of the service rendered by a utility is the actual income tax paid to the Federal Government. Riverton Consolidated Water Company v. Pennsylvania Public Utility Commission, supra, 186 Pa. Superior Ct. 1, 20, 140 A. 2d 114." In *Pittsburgh v. Pa. P.U.C.*, supra, 182 Pa. Superior Ct. 551, we ruled that where accelerated depreciation is used, the commission may refuse to allow the utility to "normalize" the effect of the tax saving, for rate purposes, by computing taxes by the straight line method.

FAIR RETURN. Columbia claimed 6.5% as a fair rate of return, and presented evidence to show that the composite cost of capital was between 6 2/3 and 6 3/4%, based on a ratio of 54% debt to 46% stock or equity capital. Complainants presented no evidence on rate of return but contend that 5.80% would be reasonable. Columbia's rate of return is based on the cost to Columbia System, since capital is furnished by Columbia's parent. The commission found a rate of return of 6.1%.

Debt Capital. The commission and the utility agree that the "historical" cost of debt capital is 4.22%, representing issues outstanding October 1964. Columbia's witnesses testified that the future or "current" cost of new debt capital would be 4.75%, in the amounts for which Columbia normally raises debt capital. The commission accepted the utility's estimate "that the pro-

spective cost of debt capital for Columbia System to the end of 1968 will range from the current commitment of 4.22 per cent to a maximum of 4.38 per cent in 1968 by applying the claimed current rate to prospective new offerings." Columbia claims the commission gave too much weight to historical cost (4.22%) and not enough weight to Columbia's "current" or estimated future cost of debt capital (4.75%). Columbia asserts this is especially true as the evidence shows interest rates have increased lately. The weight to be accorded the various cost factors in evidence is primarily a matter for the commission. "The cost of capital which is to be determined in a rate proceeding is that existing at the time the rates are established . . . that is, the commission should determine the cost, based on evidence of the recent past if the same is reliable, to the utility to obtain debt and equity capital in the future." *Riverton Consolidated Water Co. v. Pa. P.U.C.*, supra, at page 17. The commission's allowances with respect to debt capital were supported by evidence and will not be disturbed.

Equity Capital. Columbia claimed 9.50% as the cost of common stock or equity capital. In arriving at this figure Columbia adjusted earnings-price ratios upward by one third to reflect a claimed growth factor in the stocks of certain gas companies, which showed estimated costs of 9.90%; 8.95% in Columbia Systems and 10.20% in stocks of a selected group. The commission found Columbia's equity costs for the period from 1954-1963 varied between 6.10% and 7.41%, and from 1948 costs extended as high as 7.90%. For instance, the commission found that the allowable cost of Columbia's seven offerings since 1948 was 7.90%, which contrasted with the 9.90 cost rate claimed by respondent for these offerings. Market trading during the 1954-63 period showed an average price-earnings ratio of 6.75% and average dividend yield of 5.07%. (1) The commis-

sion refused to adjust the price-earnings ratios upward, as contended for by Columbia to reflect prospective increases in earnings. Columbia contends this was error. (2) Also, the commission refused to allow any offering discounts given to stockholders through subscription rights as a cost of acquiring common stock money. We think that the commission, in this rate proceeding, was not required, as a matter of law, to make any specific allowance as to the value of the rights as an additional cost of equity capital. Nor was the commission bound to accept the utility's contention that the price-earnings ratio be adjusted upward by one third to reflect an anticipated growth factor. (3) Columbia objects to the commission's use of the 1954-63 period as an evidentiary base period to ascertain the current cost of common stock money. The commission was within its powers in choosing the ten-year period, which more nearly coincided with the base year, than the longer period contended for by the utility. (4) The utility avers the commission did not give proper consideration to the evidence of the cost of transferring capital. However, the record shows the commission did accept the utility's basic estimate of 1% added to the price-earnings ratio, as the cost of transferring capital, although the commission did not agree with the utility's application of this factor in all cases. The city argues the most reliable data indicates a cost of capital of 5.09 and 5.78%, or a maximum cost of 6.00%. There is no set formula for determining rate of return which depends upon a number of factors, including payment of dividends and interest. "In weighing these factors, the commission exercises its judgment as to cost of capital. However, this judgment must be exercised upon the facts as they have been presented." *Pittsburgh v. Pa. P.U.C.*, 182 Pa. Superior Ct. 376, 385, 126 A. 2d 777 (1956). Here the commission's findings as to cost of capital are supported by the evidence.

The ultimate finding of rate of return is likewise fully supported by the evidence, shows no abuse of discretion or error of law, and will be affirmed.

OPERATING EXPENSES. The utility contends the commission erred in rejecting Columbia's adjustment of operating expenses to reflect an increase of $197,181 a "normal level of unaccounted for gas," viz., the difference between that introduced into the system and that delivered to customers. Essentially, Columbia contends the figures for unaccounted for gas, covering the test year ending March 31, 1964, and allowed by the commission, are not typical or normal, since not based on a twelve-month period ending in July or August. Under Columbia's evidence the summer termination period gives a more accurate figure due to a lack of synchronization during the winter months, caused by heating sales and difference in billing customers. Clearly, it was within the commission's discretion whether it would make an adjustment upward to "normalize" Columbia's expenses for this item of unaccounted for gas: *Pittsburgh v. Pa. P.U.C.*, supra, 178 Pa. Superior Ct. 46.

LOSS FOR SUSPENSION PERIOD. The commission suspended the effective date of Columbia's tariff supplement for a period of nine months, from July 28, 1964 to April 28, 1965. Under Columbia's calculation this resulted in a loss to it of $4,200,000. Columbia refers to §308(b) of the Public Utility Law, 66 PS §1148, providing, inter alia: "The commission shall consider the effect of such suspension in finally determining and prescribing the rates to be thereafter charged and collected by such public utility." Columbia contends the commission should be required to state the extent and nature of its consideration of the loss of gross revenue in its determination of the final rates. This Court ruled in *Pittsburgh v. Pa. P.U.C.*, supra, 171 Pa. Superior Ct. 187, and *Equitable Gas Co. v. Pa. P.U.C.*,

174 Pa. Superior Ct. 450, 102 A. 2d 235 (1954), that the commission was presumed to have considered the effect of suspension in fixing the final rates, and was not required to make a specific monetary allowance for a calculated loss allegedly due to the suspension.

CAPITAL INVENTORIES. Columbia claimed $751,535 for working capital. Included in this amount was $147,-152, representing Columbia's inventory of appliances, such as gas ranges, water heaters, dryers, incinerators and gas fired furnaces. These items were carried by the utility to promote the use of gas by builders, to whom they were ultimately sold. The commission disallowed these items as part of working capital, stating that "merchandise ultimately bought and paid for by others should not earn a return at the expense of consumers." The commission could properly exclude these items as not entering into the rate calculation.

The order of the commission is affirmed.