Lower Frederick Township Water Company, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

Argued September 11, 1979, before President Judge Bowman and Judges Wilkinson, Jr., Rogers, Blatt, DiSalle, Craig and MacPhail. Judges Crumlish, Jr. and Mencer did not participate.

*Miles Warner,* for petitioner.

*Joseph J. Malatesta, Jr.,* Deputy Chief Counsel, with him *George M. Kashi,* Chief Counsel, for respondent.

Opinion by Judge DiSalle, January 2, 1980:

The Lower Frederick Township Water Company (Company) appeals the order of the Public Utility

Commission (PUC) adopting the decision of an Administrative Law Judge (ALJ) which denied the Company's request for a rate increase. The Company argues on this appeal that the PUC acted capriciously, arbitrarily, unreasonably and with a gross abuse of discretion.

On February 3, 1977, the Company filed a supplement with the PUC proposing an increase of $26,029 or 82.9% in its annual operating revenue. The Company provides water service to some 238 customers and consists largely of a distribution system with no water source of its own and with no pumping, purification or storage facilities. It purchases water from a neighboring borough and delivers a substantially lesser amount of water to its customers by way of a system of apparently leak-ridden pipes and ill-maintained meters.

The ALJ found that the Company failed to support its proposed rate increase with substantial evidence. Specifically, the ALJ concluded that the Company failed to provide evidence sufficient to permit accurate calculation of its operating revenue and expenses, and its rate of return, factors necessary, in the ALJ's opinion, to proper evaluation of the Company's rate hike request.

The alleged operating revenue of the Company was found to be greatly understated for two reasons. Of the 24.5 million gallons of water purchased in the test year, the Company reported revenue based upon the sale of only 13.4 million gallons. While the Company claimed that 5 million of the gallons it purchased were sold under the minimum allowance permitted each customer, analysis revealed that only 2.8 million gallons of water could possibly have been sold under such allowance and that any amounts sold in excess of this limit should have been billed outside the minimum allowance rate block (a minimum charge being assessed

for amounts of water used under the minimum allowance). The ALJ thereby concluded that, pursuant to the data provided by the Company, the additional 2.2 million gallons of water which the Company alleges were subject to a minimum charge were not in fact billed for, the net effect of which was to markedly understate operating revenue. Secondly, the ALJ found that a substantial amount of the water loss during the test year (approximately 45% of the total) could be attributed to the fact that the distribution system operated by the Company had fallen into a state of disrepair and to the fact that customers were diverting water at the metering point. While unable to quantify the amount, the ALJ concluded that this water loss, due in large part to the Company's inadequate maintenance and vigilance, would also be a potential source of increased revenue.

The alleged operating expenses of the Company were found to be overstated for two reasons. First, the $10,400 salary claimed by the Company's President was found to be unsubstantiated. The ALJ found that, despite thorough questioning, the Company's President offered no *detailed* accounting of services which he rendered, that he contradicted himself with reference to the question of how much time he devoted to the Company (ten percent to one-third of his time), and that those services allegedly provided by him— *i.e.,* making long-term policy, assuring adequate supplies of water, providing for additions to the Company's infrastructure, etc.—were utterly incompatible with those necessary to the functioning of a utility of this Company's history and nature.[1] Secondly, the ALJ found that the 45% water line loss reflected the

---

[1] The Company is exceedingly small and has experienced no significant growth in recent years and does not expect to experience any such growth in the near future.

Company's irresponsibility and negligence[2] and that the expense incurred for purchasing water, therefore, was much overstated. The ALJ was simply unwilling to have the public indirectly absorb an expense magnified by a utility's shortcomings.

The ALJ also found that the Company overstated its claimed rate of return. Much of the 12% rate of return claimed represents a cost rate assigned to the Company's total accumulated debt, the largest component of which was a note in the amount of $72,815 allegedly payable to Municipal Management Services, Inc. The ALJ determined that the existence of this debt was doubtful and that a requested fair rate of return substantially founded upon this debt was, as a consequence, not supported by substantial evidence.[3]

Section 315(a) of the Public Utility Code, 66 Pa. C.S. §315(a) places the burden of proving the justness

---

[2] The ALJ noted in particular that while the Company's witnesses candidly acknowledged awareness of the line problem dating from 1974, no significant remedial action was undertaken until 1977.

[3] The ALJ pertinently noted the following:

(1) Respondent's [Company's] accounting witness testified that Municipal Management Services, Inc., is no longer in business.

(2) Respondent's president testified that the accounting witness 'misinterpreted' his statements and that the service company is still in business.

(3) Respondent's president testified that there is no written proof of the alleged debt.

(4) Respondent's president testified that no lien has been filed by the debtor against Respondent despite an outstanding debt, relating in part to services allegedly rendered since 1969, totaling $72,000.

(5) The alleged amount of interest (9%) is not evidenced in writing.

(6) Respondent's present owner purchased Respondent and became its president in 1968.

(7) The contract with the service company, which was signed by the president, was dated 1965—three years before he became associated with Respondent.

and reasonableness of a proposed rate hike squarely on the utility. It is well-established that the evidence adduced by a utility to meet this burden must be substantial. *See Johnstown v. Pennsylvania Public Utility Commission,* 184 Pa. Superior Ct. 56, 133 A.2d 246 (1957). Here, the ALJ found that the Company did not support its requested rate increase with substantial evidence. We agree.

Each of the particular shortcomings in the Company's case which the ALJ relied upon in denying rate increase is evidenced in the record. While each might be explained or interpreted in different ways, the ALJ's treatment of the matter is not unreasonable. For example, the alleged understatement of revenues and overstatement of expenses cited by the ALJ derived in large part from the simple fact that almost half of all the water purchased by the Company was unaccounted for, either as a result of being lost en route to the user or diverted by the user at the metering point. While either or both of these conditions might give rise to the interpretation that the Company desperately needed a rate increase to finance remedial measures, the ALJ concluded that the Company failed to maintain its pipelines and meters adequately and that the understated revenue and overstated expenses, factors tending to justify the Company's requested rate increase, reflected this mismanagement.

Similarly, the ALJ's rejection of the expense claimed for the salary of the Company's President

(8) Respondent's president testified that the date on the contract was 'an error'.

(9) No utility is identified on the contract.

(10) Respondent's president testified that Respondent was not identified on the contract due to an 'oversight'.

(11) No amount due was specified in the contract although the 'fee' claimed by Respondent which allegedly led to the $72,000 debt was $15,000 per year. (Citations omitted.)

might appear to be unreasonable or, worse yet, unrealistic. A salary of $10,400 for any corporation's chief executive in this day and age seems nominal to say the least. However, it is quite clear that the ALJ predicated his decision here on the fact that the Company's President was unwilling or unable to provide a definitive account of routine services he did provide, that he actually contradicted himself with reference to the amount of time he devoted to the Company's management, and that the services for which he did claim compensation were not of the sort a utility like this Company was likely to need. Under these circumstances, we do not believe the ALJ acted improperly.

The final factor cited by the ALJ to support his denial of the Company's proposed rate hike was the Company's proposed rate of return. While a 12% rate of return may not appear, in and of itself, unreasonable, it is necessary to examine the factors relied upon by the utility in calculating this rate to determine its validity. Here, the Company sought a rate of return which reflected the cost of its massive debt, the largest component of which was a note payable to Municipal Management Services, Inc. Irrespective of the propriety of considering the cost of accumulated debt when calculating a fair rate of return, the ALJ's conclusion that the nature and extent of the note payable was not proven by the Company is supported by the record.

Throughout our deliberation of this case, we have borne in mind the fact that the Company is exceedingly small, its infrastructure rundown and its capital structure ridden with debt. As we perceive it, the overriding issue is whether this sad state of affairs is due to the Company's inefficiency, irresponsible or negligence, or whether, on the other hand, it is due to factors beyond the Company's control, such as its small size and the resultant diseconomies of the scale

of its operation. This issue is largely factual in nature. Here, the factfinder made it abundantly clear that he believed the Company was responsible in large part for its own plight and that any rate hike would simply shift this responsibility onto the shoulders of the consumer. We will not disturb a factfinder's determination where it is supported by substantial evidence. Here it is so supported. We will affirm the order of the PUC.

Judge MacPHAIL concurs in the result only.

## ORDER

AND Now, this 2nd day of January, 1980, the order of the Pennsylvania Public Utility Commission dated February 9, 1978, is hereby affirmed.