Dauphin Consolidated Water Supply Company, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

Argued June 4, 1980, before President Judge CRUMLISH and Judges WILKINSON, JR., ROGERS, BLATT, CRAIG, MACPHAIL and WILLIAMS, JR. Judge MENCER did not participate.

*William J. LeBuhn*, with him *Walton F. Hill*, for petitioner.

*John A. Levin*, Assistant Counsel, with him *Steven A. McClaren*, Deputy Chief Counsel, and *Joseph J. Malatesta, Jr.*, Chief Counsel, for respondent.

OPINION BY PRESIDENT JUDGE CRUMLISH, December 31, 1980:

Dauphin Consolidated Water Supply Company[1] (Dauphin) appeals from a rate-making determination by the Pennsylvania Public Utility Commission (Commission) disallowing approximately 67% of a proposed $537,630 increase in annual operating revenues for water service. We affirm in part and remand in part.

After extensive evidentiary hearings before the Administrative Law Judge (ALJ), the Commission concluded that the test year ending January 31, 1978 necessitated a fair value finding of $12,500,000 for Dauphin's property devoted to public service and a

[1] Incorporated in Pennsylvania on June 9, 1903, Dauphin is a wholly-owned subsidiary of General Waterworks Corporation, a holding company and wholly-owned subsidiary of International Utilities Corporation, a Delaware conglomerate. Dauphin provides water service to approximately 17,300 domestic, commercial, municipal and industrial customers situated in certain boroughs and townships in Dauphin and Perry Counties.

corresponding 7.32% fair rate of return. With a $914,-939 income available for return or "fair return on fair value" and allowed operating revenue deductions of $1,853,601, including annual depreciation and tax expenses, the Commission directed Dauphin to file tariff revisions providing annual operating revenues of $2,-768,540, an increase of $180,000 over existing revenues, but $357,630 less than proposed and $211,153 lower than the ALJ's recommendation.[2]

Dauphin's appeal ranges from an attack on the Commission's fair value and fair rate of return determinations to a challenge of the operating expense findings of unaccounted-for water, purchased power, and labor-wage increases. Dauphin claims that the Commission's order is unsupported by substantial evidence and principles of law, amounts to a manifest abuse of administrative discretion, and results in an unconstitutional confiscation of property without due process of law by not allowing the company to earn a fair return on the fair value of its property.[3]

### Fair Value

Dauphin argues that the Commission's decision serves to invalidate the traditional fair value standard rate computations, ignores the impact and effects of inflation, and thereby amounts to an improper and unreasonably low valuation of utility property. We cannot agree.

For public utility valuation purposes, our Supreme Court's decision in *Pennsylvania Gas & Water Co. v.*

---

[2] The Administrative Law Judge recommended annual operating revenues of $2,979,693, a $391,153 increase over the $2,588,540 test year revenues, but $146,477 less than proposed. The decision contemplates a $978,211 income available for return, by utilizing a $12,500,000 fair value rate base and a 7.83% fair rate of return, as well as proforma operating expenses of $2,501,482.

[3] Our scope of review is well-documented and needs no repetition. *See The York Water Co. v. Pennsylvania Public Utility Commission,* 51 Pa. Commonwealth Ct. 61, 414 A.2d 138, 141 n. 7 (1980).

*Pennsylvania Public Utility Commission (P.G.&W.),*
Pa. , 424 A.2d 1213 (1980), sets several control-
ling regulatory standards. The thrust of the decision
was to dispel any assumption of a constitutionally-
mandated nexus between fair value and cost of repro-
duction or trended original cost figures. *Id.* at ,
424 A.2d at 1221. However, *P.G.&W.'s* functional ef-
fect was to put the economic theories and policies un-
derlying public utility property valuations strictly in
the hands of the Commission so long as fair value was
set somewhere between original cost and trended origi-
nal cost. *Id.*

The record clearly reveals that the Commission's
$12,500,000 fair value finding not only contemplated
trended costs in its valuation of used and useful prop-
erty but begrudgingly rejected a staff estimate based
solely on the $9,218,559 original cost of plant. In fact,
the Commission expressly recognized the then-judi-
cially mandated requirement that valuation reflects
trended cost methods which consider the economic
impact of inflation.

Upon careful review of the record and considering
the latitude now given the Commission, we conclude
that the fair value set by the Commission bears "a
real and substantial relationship to the regulatory ob-
jects sought to be obtained," namely, the fixing of
just and reasonable value figures and corresponding
rates.[4]

### Fair Rate of Return

Dauphin argues that the Commission's 7.32% fair
rate of return finding is based upon an erroneous de-
termination of the cost of common equity capital. We

---

[4] Dauphin also argues that the Commission's decision amounts
to a constitutional taking and violation of due process. However,
these contentions were found "unsound both in principle and as a
matter of judicial policy" in *P. G. & W., supra*, at , 424 A.2d at
1221.

must remand for an explanation of the Commission's conclusion.

Dauphin is a wholly-owned subsidiary of General Waterworks Corporation, which in turn, is a wholly-owned holding company subsidiary of I.U. International. General Waterworks supplies all of the capital requirements of Dauphin which issues only capital stock to its parent. Although no market data on Dauphin is available for this reason and the General Waterworks capital structure must serve as determinative, we stress the fact that I.U. International is the only member of the system that issues publicly traded common stock. Hence, a determination of either Dauphin's fair rate of return or common equity cost is logically based on the system's 57% debt and 43% common equity capital structure.

In evaluating the integral cost of common equity, the Commission evaluated the expert testimony taken before the ALJ on the fair rate of return components. Dauphin recommended a common equity cost rate of 13.60% and an overall 10.4% fair rate of return when applied to the "fair value rate base." On the other hand, the Commission staff advocated an 11.62% to 12.53% equity cost with an overall rate of return of 9.56% to 9.95% while the Consumer Advocate proposed an 11% to 11.5% equity cost rate with a 9.51% rate of return, both based upon an "original cost rate base." The ALJ then found a 14% cost of common equity capital with an overall 10.58% rate of return as applied to the original cost rate base, but derided the 10.58% overall return by 135%, the ratio of fair value to original cost, to produce a 7.83% fair rate of return.[5]

---

[5] Mathematically speaking, we must conclude that the ALJ trended fair rate of return to the fair value rate base by reducing the 10.58% overall return by the ratio of original cost to fair value (73.75%).

Approving staff's cost range recommendation, the Commission determined that a common equity cost rate of 12.46% plus the stable 8% cost rate for debt would produce an overall return rate of 9.92% applicable to the $9,218,559 original cost rate base, and provide a $914,481 income available for return. However, the Commission concluded that the cost of common equity and fair rate of return be reduced to 6.42% and 7.32%, respectively, to correspond with the $12,500,000 fair value rate base in yielding a $914,939 income available for return:

We find a fair overall rate of return of 7.32% to be appropriate when applied to our finding of fair value of $12,500,000 for Respondent's plant in service. We find income available for return to be $914,939.

We believe the fair overall rate of return of 7.32% will prospectively enable Respondent to attract new capital at a competitive cost, to maintain or improve its credit standing, to maintain the integrity of previously invested capital and to earn a return comparable to returns earned by similar risk enterprises.

In essence, the Commission determined that Dauphin had only shown the necessity for a 6.42% return in dollars to induce investors to purchase the utility's common stock, and the necessity for a 7.32% profit to utility owners in return for the use of its property.[6]

Given the basic premise that Pennsylvania public utilities are entitled to earn a fair rate of return on the fair value of its property useful in public service and the new flexibility by which the Commission can set fair value, we are unable to conclude that the Com-

---

[6] In *The York Water Co. v. Pennsylvania Public Utility Commission, supra* at 66-69, 414 A.2d at 141-43, we found it necessary to definitely relate fair rate of return with the cost of common equity capital.

mission erred in determining fair rate of return on a fair value rather than an original cost basis. *See Peoples Natural Gas Co. v. Pennsylvania Public Utility Commission*, 52 Pa. Commonwealth Ct. 201, 415 A.2d 937 (1980). However, we must again criticize the Commission's failure to make definite, consistent and detailed findings to support its decision. *See The York Water Co. v. Pennsylvania Public Utility Commission*, 51 Pa. Commonwealth Ct. 61, 69, 414 A.2d 138, 140 (1980). Without explanation, we are unable to determine whether substantial evidence exists to support a methodology which reduces the cost of common equity capital by more than 50% and the fair rate of return by more than 25% while only changing by $458 the income available for return, all under the aegis of fair value.[7]

We remand this portion of the case to the Commission for a more comprehensive explanation of fair rate of return and its integral common equity capital cost, supported and delineated in the record and judiciously explained in its conclusion. *See Equitable Gas Co. v. Pennsylvania Public Utility Commission*, 45 Pa. Commonwealth Ct. 610, 618, 405 A.2d 1055, 1060 (1979).

## OPERATING EXPENSES

Basic rate-making principles mandate that public utilities are entitled to set rates which will allow re-

---

[7] We are fully aware of the fact that the Commission has historically utilized supporting figures for fair rate of return and its integral cost of common equity, even though neither General Waterworks nor Dauphin publicly trades common stock, *see T. W. Phillips Gas & Oil Co. v. Pennsylvania Public Utility Commission*, 50 Pa. Commonwealth Ct. 217, 222-24, 412 A.2d 1118, 1121-22 (1980), and *see generally The York Water Co. v. Pennsylvania Public Utility Commission, supra* at 68-69, 414 A.2d at 142; and *The Peoples Natural Gas Co. v. Pennsylvania Public Utility Commission*, 47 Pa. Commonwealth Ct. 512, 409 A.2d 446, 452-53 (1979), and can see no reason why such support is absent here.

632

covery of those operating expenses reasonably necessary to provide adequate service to customers, while earning a fair return on the investment in plant used and useful in providing the utility service. *Western Pennsylvania Water Co. v. Pennsylvania Public Utility Commission*, 54 Pa. Commonwealth Ct. 187, 422 A.2d 906 (1980). Dauphin contests the Commission's treatment of its claimed unaccounted-for water, purchased power and labor expenses.

## Unaccounted-for Water Expense

Dauphin reported that 25.3% of the total water delivered to its distribution system was unaccountable in the test year ending January 31, 1978, but that the percentage dropped to 21.1% as of June 30, 1978 due to the discovery and elimination of large leaks at the Enola raw water reservoir. Dauphin instituted a new method of raw water treatment by which it anticipated that unaccounted-for water would remain at approximately 21.1% of total water in the distribution system.

The ALJ accepted Dauphin's suggested $2,887 downward adjustment to expenses, reflecting a decrease in the cost of power and chemicals used to pump the chlorinated, unfiltered raw water from Stoney Creek to the Enola reservoir. However, the Commission rejected the ALJ's recommendation, found that Dauphin's unaccounted-for water level was abnormally high, and concluded that test year expenses should be reduced by $50,525 to reflect a comparison with the 19.3% average water losses experienced by General Waterworks in its other Pennsylvania subsidiary operations.

Dauphin initially argues that the proper level of unaccounted-for water can only be determined by reference to its own system or other comparable systems. By not taking into account such essential factors as the extent of metering, degree and variability of pres-

sure, leak detection problems, age and extent of distribution mains, customers served, and service conditions, Dauphin argues that the Commission might as well have chosen to compare all Pennsylvania water utilities beginning with the letter "D" for Dauphin. Here, we must agree.

The Commission clearly accepted the Consumer Advocate expert's testimony that expenses, aside from the cost of power and chemicals, such as source of supply, power and pumping, purification and laboratory, and transmission and distribution must also decrease with changes in the volume of water entering the system:

> Our review of the record satisfies us that the four other expenses categories mentioned . . . should vary proportionately with changes in the volume of water entering Respondent's distribution system—a decrease in unaccounted for water should produce a decrease in these other expense items.

However, the Commission chose to base its determination on a comparison with other General Waterworks operations which are neither specified nor supported by appropriate data or figures. The districts may have divergent service areas, plants in service, and operation problems, as Dauphin argues, but the Commission's opinion provides little enlightenment for our review.

By rejecting Administrative Law Judge CHIO-VERO's reliance on Dauphin's June 30, 1978 estimated reduction in water losses, the Commission presents a second question on the application of traditional test year methodology. The Commission argues here that Dauphin was given the option of a historic or future test year, chose the period February 1, 1977 through January 31, 1978, and is therefore unable to utilize

out-of-test year events and expenses. Under these circumstances, we cannot agree.

The Commission clearly has the authority to exercise its discretion in adopting "the most reliable, practical, and realistic bases for determining revenues and expenses for rate purposes." *Berner v. Pennsylvania Public Utility Commission,* 177 Pa. Superior Ct. 19, 23, 107 A.2d 882, 884 (1954). In *Pittsburgh v. Pennsylvania Public Utility Commission,* 208 Pa. Superior Ct. 260, 279, 222 A.2d 395, 405 (1966), Columbia Gas of Pennsylvania unsuccessfully argued that the Commission's decision on unaccounted-for gas, covering the test year ending March 31, 1964, was atypical due to a failure to include a more accurate summer termination period. However, our Courts have not only held that "[t]he objective of test year figures is to reflect typical conditions," *Pittsburgh v. Pennsylvania Public Utility Commission,* 178 Pa. Superior Ct. 46, 66, 112 A.2d 826, 834 (1955), but that "there exists a very definite forward-looking aspect in the rate-making process." *Pittsburgh v. Pennsylvania Public Utility Commission,* 42 Pa. Commonwealth Ct. 242, 245, 400 A.2d 672, 674 (1979) (United Mine Workers strike necessitated Duquesne Light Company surcharge to cover extraordinary purchases of power). In fact, where an unusual situation or non-recurring item exists as the cause of distortion to test year figures, the Commission should adjust its determination. *Pittsburgh v. Pennsylvania Public Utility Commission,* 187 Pa. Superior Ct. 341, 361, 144 A.2d 648, 659 (1958) (steel strike caused atypical losses to the Manufacturers Light and Heat Company). Although the case before us has none of the exigent circumstances found in the normal adjustment situation, we are persuaded that the Commission abused its discretion in passing over the ALJ's 21.1% recommendation without analysis. Although the change occurs five

months after the close of the test year, the Commission's summary approval of the 19.3% General Waterworks unaccounted-for water expense warrants further attention, especially where the ultimate need to reflect typical yearly conditions and the resulting effect is an efficient reduction in expense. *See generally Bell Telephone Co. v. Pennsylvania Public Utility Commission*, 47 Pa. Commonwealth Ct. 614, 624, 408 A.2d 917, 923 (1979).

Inherent in the Commission's power to establish just and reasonable rates is the authority to determine the legitimacy of operating expenses reported by the utility. *Id.* at 628, 408 A.2d at 925. Although the burden of proof rests with Dauphin, the Commission is charged with great responsibilities to both the producer and the consumer, not the least of which is the necessity for definite, consistent and detailed findings to support its decision. *See The York Water Co. v. Pennsylvania Public Utility Commission, supra*, at 64, 414 A.2d at 140. In the case before us, we are unable to determine whether Dauphin properly sustained its burden of proof, whether the Commission accurately determined 19.3% as the allowable unaccounted-for water expense. Further, we are also unable to determine either the reasonableness of the expense or whether the expenses reflect mismangement. *See Lower Frederick Township Water Co. v. Pennsylvania Public Utility Commission*, 48 Pa. Commonwealth Ct. 222, 409 A.2d 505 (1980).

We therefore remand this portion of the case to the Commission for new and detailed findings and conclusions.

*Purchased Power*

Dauphin claimed that its annualized purchased power expenses should be increased by $9,339 over the $235,263 test year expenses since a 10% water produc-

tion increase was the cause for an 11.2% increase in electric power consumption.

Although the Commission recognized a large increase in the test year's purchased power expense, it concluded that Dauphin not only failed to establish a precise relationship between kilowatt usage (power expense) and water sold (revenues) for the test year, but could produce no evidence to show a continued 11.2% yearly increase:

> We agree with Staff that Respondent has not presented sufficient evidence to fully support its normalized purchased power expense of $244,662. Staff has, in recommending that $206,732 be allowed for this expense item, based its allowance on specific facts of record—actual 1976 expense plus known rate increases.

> Dauphin experienced two purchased power rate increases in 1976—$4,706 in April and $13,803 in August. Staff added the amount of these two rate increases, to the booked purchased power costs of $188,223 for 1976 to arrive at a level of $206,732 for this expense item. We accept Staff's recommendation since it is supported by actual costs, and therefore reduce Respondent's claim by $37,930.

Dauphin responds that the Commission's demand for a precise relationship between power expense and water sold is inappropriate, that this purchased power expense is more directly related to water produced than to water sold, and that the use of 1976 kilowatt levels as a basis for measuring the test year's power expense constitutes a manifest denial of its right to recover reasonable operating expenses.

Clearly, the burden of proof and justification for operating expenses rests squarely on the utility's shoulders. *See The Bell Telephone Co. v. Pennsylva-*

*nia Public Utility Commission, supra* at 629, 408 A.2d at 925. More clearly, this Court has little latitude to interfere with the declared expertise of the Commission in matters pertaining to economic theory. *See Western Pennsylvania Water Co. v. Pennsylvania Utility Commission, supra* at 191-92, 422 A.2d at 909.

· We do not take exception to the Commission's request for a fully documented, reasonable explanation of whether the increase in production due to additional demand on the system was commensurate with the number of kilowatt hours used. However, we must object to the Commission's demand for the showing of a direct precise relationship between power expense and water sold, especially in light of the following conclusion and the Commission's prior expressed concern with the relationship between unaccounted-for water and the cost of power and power and pumping.

A water utility purchases power primarily for the operation of pumping and filtration systems, and to a much lesser extent in lighting and maintenance of its general offices and workshops. Logically, this purchased power is utilized in *both* water production and water sales. Dauphin effectively argues that revenue is an inappropriate measure since different rate schedules will apply to water sold and may disproportionately affect revenues in relation to power needed to produce water. We agree. At the very least, purchased power expense should reflect some portion of the 10% increase in water production and a relationship with such factors as non-metered water usage or a minimum 19.3% unaccounted-for water figure and some interest in whether imprudent management or unusual circumstances resulted in the 11.2% power increase.

Since Dauphin ties these problems to the leaks discovered at the raw water reservoir, we will remand

the issue to the Commission to be determined in conjunction with the unaccounted-for water expense. We reiterate the fact that the burden rests squarely with the utility but emphasize the Commission's obligation to both the utility for claimed reasonable expenses and the citizens of the Commonwealth.

## Labor Expense

Dauphin requested labor expenses for the test year ending January 31, 1978, based on payroll increases effective January 1, 1979 and incurred as of January 31, 1979. The ALJ determined that Dauphin's $52,-108 adjustment was reasonable and consistent with Pennsylvania rate-making objectives:

> The costs involved herein are, without question, fixed and determinable. To ignore that they will be incurred precisely as revenues are earned or unequivocably matched is nonsensical and would only serve to cause havoc with the Company's *real* expenses and possibly result in an untimely additional request for a rate increase. This prospect is one to be avoided, particularly in view of the time and expense involved in such a proceeding, which ultimately works to the detriment of the ratepayer.

However, the Commission concluded that the test year methodology must prevail:

> We agree with the Consumer Advocate that allowance of a labor adjustment, reflecting the level of payroll costs at a point in time twelve (12) months beyond test year end, would result in a mismatch of revenues and expenses, and we therefore find the $37,621 adjustment recommended by the Consumer Advocate as proper since this adjustment limits labor expense increases to a period ending six months beyond test year end.

The Commission argues that if Dauphin had wished to consistently file its operating expenses on the basis of a future test year, it had every opportunity to do so.

The Commission seems to have made a policy of accepting wage increases effective six months after the test year.[8] Necessity dictates that a "rate proceeding must have some finality, and for this purpose a test year is used and accepted as it may be adjusted by the commission for unusual changes." *See Pittsburgh v. Pennsylvania Public Utility Commission, supra* at 363, 144 A.2d at 660. By providing Dauphin with the six-month extension for labor expense adjustments, we must conclude that the Commission reasonably exercised its discretionary authority.

Accordingly, we

## ORDER

The Pennsylvania Public Utility Commission order, adopted March 29, 1979 and entered April 5, 1979, is hereby affirmed on the fair value and labor-wage expense, but the record is remanded to the Commission for new, additional and detailed findings of fact and conclusions of law on fair rate of return, unaccounted-for water expense, and purchased power expense, so as to enable this Court on review to determine the merits of an appeal, if taken, from such revised order.

---

[8] *See Pennsylvania Public Utility Commission v. Pennsylvania Gas & Water Co.,* 47 Pa. P.U.C. 482 (1974) (approved wage increases effective five months after test year end); *Pennsylvania Public Utility Commission v. The Bell Telephone Co.,* 45 Pa. P.U.C. 675 (1971) (four months); and *Pittsburgh v. Pennsylvania Public Utility Commission,* 208 Pa. Superior Ct. 260, 274-75, 222 A.2d 395, 403 (1966) (one month). *Compare Pennsylvania Public Utility Commission v. The York Water Co.,* 44 Pa. P.U.C. 1 (1968) (rejected wage increases effective seven months after test year end); and *Pennsylvania Public Utility Commission v. Dauphin Consolidated Water Supply Co.,* 14 PUR 4th 198 (1976) (seventeen months).