# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Tanya J. McCloskey, Acting     :
Consumer Advocate,     :
           Petitioner     :
    :
       v.     :    No. 1549 C.D. 2018
    :    Argued: December 10, 2019
Pennsylvania Public Utility     :
Commission,     :
           Respondent     :


BEFORE:     HONORABLE RENÉE COHN JUBELIRER, Judge
                HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE ANNE E. COVEY, Judge


OPINION BY
JUDGE COHN JUBELIRER                 FILED: January 15, 2020


Before this Court is the petition for review of Tanya J. McCloskey, Acting Consumer Advocate (Office of Consumer Advocate (OCA)), challenging the October 25, 2018 Order of the Pennsylvania Public Utility Commission (Commission) that approved a general rate increase filed by UGI Utilities, Inc.-Electric Division (UGI), which OCA contends results in utility rates that are not just and reasonable. The Commission ultimately approved an annual revenue increase for UGI of $3.201 million, or 3.6%. Although the underlying general rate proceeding involved the litigation or settlement of numerous issues, the only issues remaining for our consideration are: whether Sections 315, 1301, and 1301.1 of the Public Utility Code (Code), 66 Pa. C.S. §§ 315, 1301, 1301.1, support UGI's

calculation of its rate base,[1] rather than OCA's calculation of that rate base, and whether the Commission's acceptance of UGI's calculations is supported by substantial evidence. OCA contends that the approved rates are inconsistent with the Code and the Commission's Decision is not supported by substantial evidence. The Commission, UGI, which has intervened, and the Energy Association of Pennsylvania (EAP), which has filed an *amicus curiae* brief in favor of affirmance, argue the Commission's determinations are supported by the plain language of Sections 315(e) and 1301.1(b) of the Code, the purpose of those statutory provisions, and the record.

## I. Background

To better understand the nature of UGI's general rate proceeding, OCA's objections to UGI's proposed rate increase, and the Commission's Decision, we begin with some basic principles of ratemaking, the Commission's role in the ratemaking process, and changes to the ratemaking process made by the General Assembly in 2012 and 2016.

### A. *Ratemaking Under the Code*

#### 1. General Principles

Section 1301(a) of the Code mandates that "[e]very rate made, demanded, or received by any public utility . . . shall be just and reasonable, and in conformity with [the] regulations or orders of the [C]ommission." 66 Pa. C.S. § 1301(a). Pursuant to the just and reasonable standard, a utility may obtain "a rate that allows

---

[1] A utility's "[r]ate base" is "[t]he value of the whole or any part of the property of a public utility which is used and useful in the public service." Section 102 of the Code, 66 Pa. C.S. § 102.

it to recover those expenses that are reasonably necessary to provide service to its customers[,] as well as a reasonable rate of return on its investment." *City of Lancaster (Sewer Fund) v. Pa. Pub. Util. Comm'n*, 793 A.2d 978, 982 (Pa. Cmwlth. 2002). There is no single way to arrive at just and reasonable rates, and "[t]he [Commission] has broad discretion in determining whether rates are reasonable" and "is vested with discretion to decide what factors it will consider in setting or evaluating a utility's rates." *Popowsky v. Pa. Pub. Util. Comm'n*, 683 A.2d 958, 961 (Pa. Cmwlth. 1996). "Under traditional ratemaking, utilities may not change rates charged to customers outside of a base rate case." *McCloskey v. Pa. Pub. Util. Comm'n*, 127 A.3d 860, 863 n.2 (Pa. Cmwlth. 2015).

At issue here is a general rate filing governed by Section 1308(d) of the Code, which provides the procedures for changing rates, the time limitations for the suspension of the new rates, and the time limitations on the Commission's actions. 66 Pa. C.S. § 1308(d).[2] The Commission is required to investigate all

---

[2] Section 1308(d) provides:

> **(d) General rate increases**.--Whenever there is filed with the commission by any public utility described in paragraph (1)(i), (ii), (vi) or (vii) of the definition of "public utility" in section 102 (relating to definitions), and such other public utility as the [C]ommission may by rule or regulation direct, any tariff stating a new rate which constitutes a general rate increase, the [C]ommission shall promptly enter into an investigation and analysis of said tariff filing and may by order setting forth its reasons therefor, upon complaint or upon its own motion, upon reasonable notice, enter upon a hearing concerning the lawfulness of such rate, and the [C]ommission may, at any time by vote of a majority of the members of the [C]ommission serving in accordance with law, permit such tariff to become effective, except that absent such order such tariff shall be suspended for a period not to exceed seven months from the time such rate would otherwise become effective. Before the expiration of such seven-month period, a majority of the members of the [C]ommission serving in accordance with law, acting unanimously, shall make a final decision and order, setting forth its reasons

**(Footnote continued on next page…)**

3

general rate increase filings. *Popowsky*, 683 A.2d at 961. Section 315(a) of the Code places the burden of proving the reasonableness of a proposed rate on the utility. 66 Pa. C.S. § 315(a). The evidence necessary to meet that burden must be substantial. *Lower Frederick Twp. Water Co. v. Pa. Pub. Util. Comm'n*, 409 A.2d 505, 507 (Pa. Cmwlth. 1980). To meet this burden of proof, a utility uses a test year, which is a snapshot of time that reflects the typical conditions, revenues, expenses, and capital costs of the utility. *See Green v. Pa. Pub. Util. Comm'n*, 473

---

**(continued…)**

> therefor, granting or denying, in whole or in part, the general rate increase requested. If, however, such an order has not been made at the expiration of such seven-month period, the proposed general rate increase shall go into effect at the end of such period, but the [C]ommission may by order require the interested public utility to refund, in accordance with section 1312 (relating to refunds), to the persons in whose behalf such amounts were paid, such portion of such increased rates as by its decision shall be found not justified, plus interest, which shall be the average rate of interest specified for residential mortgage lending by the Secretary of Banking in accordance with the act of January 30, 1974 (P.L. 13, No. 6), referred to as the Loan Interest and Protection Law, during the period or periods for which the [C]ommission orders refunds. The rate in force when the tariff stating such new rate was filed shall continue in force during the period of suspension unless the [C]ommission shall grant extraordinary rate relief as prescribed in subsection (e). The [C]ommission shall consider the effect of such suspension in finally determining and prescribing the rates to be thereafter charged and collected by such public utility, except that the [C]ommission shall have no authority to prescribe, determine or fix, at any time during the pendency of a general rate increase proceeding or prior to a final determination of a general rate increase request, temporary rates as provided in section 1310, which rates may provide retroactive increases through recoupment. As used in this part general rate increase means a tariff filing which affects more than 5% of the customers and amounts to in excess of 3% of the total gross annual intrastate operating revenues of the public utility. If the public utility furnishes two or more types of service, the foregoing percentages shall be determined only on the basis of the customers receiving, and the revenues derived from, the type of service to which the tariff filing pertains.

66 Pa. C.S. § 1308(d).

A.2d 209, 213-15 (Pa. Cmwlth. 1984) (describing generally items within a test year); *City of Pittsburgh v. Pa. Pub. Util. Comm'n*, 112 A.2d 826, 832 (Pa. Super. 1955) (indicating that a condition to be considered in examining a test year is the weather during that year). A utility could use a historic test year (HTY), the year prior to the filing of the rate case, or a future test year (FTY), the year ending shortly before the date the new rates would go into effect, to determine the amount of the rate base upon which its new rates would be calculated. Historically, in order for certain facility or related costs to be included in a utility's rate base, the facility had to be "used and useful" and "in service to the public" **at the time** the rate base was being calculated. Section 1315 of the Code, 66 Pa. C.S. § 1315.[3] However, the manner in which a utility could meet its burden of proof **changed** in 2012, when the General Assembly enacted a series of amendments to the Code, including to Section 315(e), which addressed the type of test year a utility could use to support its proposed rates.

---

[3] Section 1315 provides:

> Except for such nonrevenue producing, nonexpense reducing investments as may be reasonably shown to be necessary to improve environmental conditions at existing facilities or improve safety at existing facilities or as may be required to convert facilities to the utilization of coal, the cost of construction or expansion of a facility undertaken by a public utility producing, generating, transmitting, distributing or furnishing electricity shall not be made a part of the rate base nor otherwise included in the rates charged by the electric utility until such time as the facility is used and useful in service to the public. Except as stated in this section, no electric utility property shall be deemed used and useful until it is presently providing actual utility service to the customers.

66 Pa. C.S. § 1315.

## 2. Act 11 of 2012 – Section 315(e) of the Code

By the Act of February 14, 2012, P.L. 72, No. 11 (Act 11), the General Assembly amended Section 315(e) to allow a utility to use a "**fully projected future test year**" (FPFTY) to satisfy its burden of proving the reasonableness of its proposed rates. 66 Pa. C.S. § 315(e) (emphasis added). The FPFTY is "the 12-month period beginning with the first month that the new rates will be placed in effect after application of the full suspension period permitted under section 1308(d) [(a period not to exceed seven months)]." *Id.* Section 315(e) requires that:

> Whenever a utility utilizes a [FTY] or a [FPFTY] in any rate proceeding and such [FTY] or a [FPFTY] forms a substantive basis for the final rate determination of the [C]ommission, the utility shall provide, as specified by the [C]ommission in its final order, appropriate data evidencing the accuracy of the estimates contained in the [FTY] or a [FPFTY], and the [C]ommission may after reasonable notice and hearing, in its discretion, adjust the utility's rates on the basis of such data.

*Id.* As part of the Act 11 amendments to Section 315(e), the General Assembly added the following: "Notwithstanding section 1315 (relating to limitation on consideration of certain costs for electric utilities), the [C]ommission may permit facilities which are projected to be in service during the fully projected future test year to be included in the rate base." *Id.*

In its *Implementation of Act 11 of 2012* Final Order, 299 P.U.R.4th 367 (August 2, 2012), 2012 WL 3249678 (*Final Implementation Order*), issued after holding a working group with stakeholders, the Commission explained the Act 11

amendments were intended "to reduce regulatory lag[4] due to the use of rate case inputs that [were] outdated by the time new base rates bec[a]me effective." *Id.* at 2. The addition of the ability of a utility to use a FPFTY, the Commission indicated, would substantially reduce "the risks associated with regulatory lag" "because the new rates w[ould] be consistent with the test year used to establish those rates for at least the first year." *Id.* at 3. The Commission further noted the exemption to Section 1315's "used and useful" requirement now included in Section 315(e) allowed it discretion in deciding whether to include in a utility's rate base facilities that are not yet used and useful but are projected to be during the FPFTY. *Id.* at 3-4. The Commission indicated that, where a FPFTY is used and a utility is permitted to include a facility that is not yet in service, it "expect[ed] that in subsequent base rate cases, the utility [would] be prepared to address the accuracy of the [FPFTY] projections made in its prior base rate case." *Id.* at 5. OCA "support[ed]" the Commission's interpretation in its comments during the Act 11 implementation process and indicated that the use of the FPFTY could result in fewer rate increases on customers in the future. *Id.* at 4.

The General Assembly did not end its amendments to the ratemaking provisions of the Code in 2012.

### 3. Act 40 of 2016 – Section 1301.1 of the Code

In 2016, the General Assembly enacted the Act of June 12, 2016, P.L. 332, No. 40 (Act 40), in which it added Section 1301.1 to the Code, 66 Pa. C.S.

---

[4] Regulatory lag is "a delay between the imposition of wholesale costs on a utility and state regulatory commission approval of a retail rate increase. Regulatory lag is inherent in many systems of retail rate regulation . . . ." *Kentucky West Virginia Gas Co. v. Pa. Pub. Util. Comm'n*, 862 F.2d 69, 75 (3d Cir. 1988).

§ 1301.1. Act 40 addressed the computation of income tax expenses for ratemaking purposes and eliminated the use of the consolidated tax savings adjustment (CTA). The CTA required a utility to adjust its rate base to account for the amount of tax savings it received by filing its taxes jointly with its parent and/or affiliated entities. In eliminating the use of the CTA, Pennsylvania joined the majority of states, which do not use the CTA. *See* H. 200th Sess., Feb. 8, 2016, at 117.[5] Section 1301.1(a) provides:

> If an expense or investment is allowed to be included in a public utility's rates for ratemaking purposes, the related income tax deductions and credits shall also be included in the computation of current or deferred income tax expense to reduce rates. If an expense or investment is not allowed to be included in a public utility's rates, the related income tax deductions and credits, including tax losses of the public utility's parent or affiliated companies, shall not be included in the computation of income tax expense to reduce rates. The deferred income taxes used to determine the rate base of a public utility for ratemaking purposes shall be based solely on the tax deductions and credits received by the public utility and shall not include any deductions or credits generated by the expenses or investments of a public utility's parent or any affiliated entity. . . .

66 Pa. C.S. § 1301.1(a). However, recognizing that a differential could result between the ratemaking procedures used prior to the effective date of subsection (a) (applying the CTA), and the computation now in effect (excluding the CTA), the General Assembly mandated in subsection (b) how the revenue from that differential should be used. Per that subsection, "the differential shall be used as follows: (1) fifty percent to support reliability or infrastructure related to the rate-base eligible capital investment as determined by the commission; and (2) fifty

---

[5] Available at https://www.legis.state.pa.us/WU01/LI/HJ/2016/0/20160208.pdf#page=18 (last visited January 8, 2020).

8

percent for general corporate purposes." 66 Pa. C.S. § 1301.1(b). The General Assembly's restriction on the use of this revenue applies until December 31, 2025. 66 Pa. C.S. § 1301.1(c)(1).

With these principles and statutory provisions in mind, we turn to the facts of UGI's rate case.

### B. UGI's Rate Case

"UGI provides electric distribution services to approximately 61,832 residential, commercial[,] and industrial customers." (Commission Opinion (Op.) at 2.) It maintains over 1200 miles of underground and overhead primary distribution lines, 12 distribution substations, and 49 distribution circuits. Its last base rate case was in 1996. On January 26, 2018, UGI filed a new tariff, which was to become effective on March 27, 2018, that UGI later amended to reflect certain changes in federal tax law. "UGI proposed a rate base change that would have increased its annual revenues by $7.705 million, or 8.6%, based on a . . . FPFTY[] ending September 30, 2019." (*Id.* at 1.) The use of September 30, 2019, as the end of the FPFTY reflects the use of a "year-end rate base methodology" (year-end methodology). (*Id.* at 18.) UGI asserted the proposed rate increase reflected the business environment it currently faced, including the "accelerated investment in the repair, replacement or improvement of an aged and aging distribution system; the modernization of core technology systems . . . ; and modest increases in employee wages and salaries since its last base rate case in 1996." (*Id.* at 1-2.) UGI claimed that it was prevented from earning a fair rate of return on its investment at the present rate levels due to the growth in capital and operating costs, as well as stagnation in customer usage and growth trends. (*Id.*)

UGI further asserted that under Act 40, it was required to compute what the CTA would have been, here, $75,400, and then certify that this amount (Act 40 savings) would be used in accordance with Section 1301.1(b). Pointing out that its capital expenditures for reliability and infrastructure projects for the FPFTY exceeded $11 million, which was far greater than 50% of $75,400, and that its general corporate expenses likewise far exceeded the 50% requirement, UGI contended it complied with Section 1301.1(b)'s requirements.

By operation of law, the tariff was suspended, pursuant to Section 1308(d) of the Code, until October 27, 2018. In accordance with the requirement that all general rate cases be investigated, *Popowsky*, 683 A.2d at 961, the Bureau of Investigation and Enforcement (I&E) began an investigation of the proposed general rate increase.

### C. Objections to UGI's Rate Case

OCA, along with others including the Office of Small Business Advocate (OSBA) and two UGI customers, filed complaints against UGI's proposed rate increase. (Commission Op. at 3.) I&E also opposed UGI's proposed rates. OCA, OSBA, and I&E particularly objected to UGI's calculation of its rate base using facilities and costs that were projected to be in effect as of the **end** of the FPFTY. They asserted that using this calculation would allow UGI to **overcollect** because the proposed rates included costs that would not be incurred by UGI on the day the rates went into effect, October 27, 2018, but would be incurred throughout various points within the FPFTY, ending September 30, 2019. Instead, they proposed using an "**average rate base methodology**" that would combine the costs listed for the beginning of the FPFTY and the costs listed at the end of the FPFTY and divide the total by two. (*Id.* at 15.) This methodology, they contended, resulted in

10

a more just and reasonable rate. They also suggested that the same methodology be applied to UGI's depreciation expenses. OCA contended this position was supported by the decision of the Illinois Commerce Commission in *Re North Shore Gas Company*, (Ill. C.C. No. 12-0511/0512, June 18, 2013), 2013 WL 3762292, which rejected the use of year-end methodology in favor of an average rate base methodology.

OCA further sought a downward adjustment to UGI's rate base in the amount of $75,400, UGI's Act 40 savings. OCA contended that UGI did not prove that it would use that $75,400 as required by Section 1301.1(b) because it had not provided an accounting for those funds and, therefore, UGI should not be able to retain those funds. OCA observed that UGI's approach to satisfying this requirement should be rejected as it would not show actual use of the funds for the required purposes.

## II. Recommended Decision and the Commission Decision

### A. *Recommended Decision*

Following the receipt of witness testimonies, documentary evidence, other evidentiary filings, and an evidentiary hearing, two Administrative Law Judges (ALJs) issued a Recommended Decision. After providing an overview of the amendments to Section 315(e) of the Code, the ALJs held that, following Act 11, a utility may use the FPFTY in a base rate case to project items such as revenues, operating expenses, and capital expenditures throughout the 12-month period beginning with the first month the rates go into effect. (Recommended Decision (R.D.) at 13.) Noting that while a fundamental principle of regulating utilities is that a public utility be permitted to include projects in a rate base and earn a reasonable return on its investments **only** when the project becomes used and

11

useful, the ALJs concluded that Act 11 **altered** this principle by allowing the use of the FPFTY to address the risks associated with regulatory lag. Citing the plain language of Section 315(e) and the policy behind its enactment, the ALJs accepted the use of the year-end methodology proposed by UGI. The ALJs were particularly persuaded by the exemption from Section 1315's "used and useful" requirement given to utilities that sought to meet their burden of proof using a FPFTY. (R.D. at 18-19.) However, the ALJs did not approve all of UGI's projected facilities. They rejected UGI's proposed "Electrical Engineering and Operations Center" (Operations Center), which added $17.3 million to UGI's FPFTY, as being in its preliminary planning stages and because there was no "reasonable certainty that it [would] be in operation in the FPFTY." (*Id.* at 22-24.) The ALJs rejected, as not persuasive, the Illinois Commerce Commission's decision in *North Shore Gas Company*, observing that decisions of other jurisdictions were not relevant to Pennsylvania rate cases due to, among other reasons, differences in statutory language and ratemaking principles. (R.D. at 21.) The ALJs acknowledged OCA's concern regarding the possibility of a utility overcollecting based on overstated projections, but indicated such issues could be addressed through protections the Commission could invoke, including verifications in subsequent rate filings or the imposition of an audit. (*Id.* at 22.)

The ALJs likewise agreed that UGI satisfied the requirements of Act 40, the language of which the ALJs found to be clear and unambiguous. (*Id.* at 110.) Reasoning that Act 40 does not state within Section 1301.1(b) any specific requirements for demonstrating the use of funds, the ALJs held that UGI was not required to show exactly where the Act 40 savings would be spent. (*Id.*) The ALJs found that the testimony of UGI's witness explaining how UGI's capital and

12

general corporate purpose expenditures far exceeded the 50% threshold found in Section 1301.1(b) supported UGI's ability to retain the full $75,400. (*Id.* at 111.) Finding OCA's contrary argument to be unpersuasive and without support in the Code, the ALJs recommended the Commission approve UGI's retention of the full $75,400 to be used in accordance with Act 40.

### B. Exceptions and Replies

OCA filed exceptions to the ALJs' acceptance of UGI's proposed rate base calculated using the year-end methodology. OCA contended that because the plain language of Act 11 did not specifically address the type of methodology to be used in conjunction with a FPFTY, the average rate base methodology must be used to ensure the proposed rates would be just and reasonable as required by Section 1301. UGI responded that the use of the year-end methodology was consistent with the plain language of Act 11, the purpose of Act 11 to reduce regulatory lag, and the prior use of that methodology in ratemaking under the FTY process.

OCA also filed an exception to the ALJs' recommendation that the Commission adopt UGI's Act 40 proposal. OCA argued that Section 1301.1(b) requires a utility to provide an accounting for how these funds are being used to benefit ratepayers when rates are being set, at least until December 31, 2025, and the ALJs' interpretation of that provision rendered Section 1301.1(b) meaningless. According to OCA, UGI failed to establish its proper use of these funds and those amounts should be used to offset the rate base in this case. UGI responded that it complied with Act 40's directives and, therefore, the exception should be denied. UGI contended Section 1301.1(b) does not contain any requirement that an accounting be given in order for a utility to retain those amounts.

13

*C. The Commission Decision*

Upon its review, the Commission agreed with and adopted the ALJs' recommendation and rationale that UGI be permitted to utilize a year-end methodology for calculating its rate base. Pointing to the purposes of Act 11 to address regulatory lag and to encourage plant investment to counter aging utility infrastructure, the Commission explained these purposes are addressed by allowing the use of the FPFTY. Reviewing the statutory language of Section 315(e), and its exemption from Section 1315 for utilities using the FPFTY, the Commission held that the "used and useful" language in Section 1315 is not a bar to including plants added during the FPFTY. (Commission Op. at 23-24.) According to the Commission, the use of the FPFTY, as authorized by Section 315(e), allows a utility to project revenue requirements and ratemaking components throughout the 12-month period beginning with the first month the new rates would begin and to recover those amounts as part of the rate base. Further, in reviewing the rate base approved by the ALJs, the Commission affirmed their exclusion of the $17.3 million Operations Center from UGI's rate base, agreeing there was insufficient evidence to establish it would be in service during the FPFTY. (*Id.* at 31.)

The Commission found no error in the ALJs' rejection of the Illinois Commerce Commission's decision in *North Shore Gas Company*. The Commission observed, among other things, that it was not bound by such decision and "it would be inappropriate to consider another jurisdiction's statute where there was no indication that the General Assembly based Pennsylvania legislation on [the] legislation adopted in other jurisdictions." (Commission Op. at 25 (citing *Elder v. Orlucky*, 515 A.2d 517, 522 (Pa. 1986)).)

14

Finally, in response to OCA's concerns that UGI may have overstated its projections, the Commission agreed with the ALJs that this issue is addressed through other available protections. In addition to requiring verification through a subsequent rate filing, Section 315(e) specifically authorizes the Commission to **audit** a utility that uses a FPFTY to determine whether such projections are accurate and to **adjust** the utility's "rates to reflect material differences." (*Id.* at 26.) For these reasons, the Commission denied OCA's exception to the use of the year-end methodology.

Next, after reviewing the language of Section 1301.1 and the purpose of Act 40, which "was to move away from Pennsylvania's past practice of requiring a CTA to a public utility's tax expenses when setting rates in a base rate proceeding," the Commission agreed with the ALJs that this language was clear and unambiguous and supported UGI's position. (*Id.* at 152.) The Commission explained:

> Section 1301.1(a) specifies how income tax expense is to be computed for ratemaking purposes in base rate cases, while Section 1301.1(b) specifies how utility operating income generated by the operation of Section 1301.1(a) must be used by the affected public utilities until December 31, 2025. Based on a plain reading of the statute, Section 1301.1(b) requires that 50% of the Act 40 savings be used for reliability or infrastructure purposes, and the other 50% of the Act 40 savings be used for general corporate purposes. The statute does not require public utilities to provide specific information concerning how the amounts would be used.

(*Id.*) The Commission found that UGI had presented substantial evidence to show its compliance with Act 40's requirements. This evidence, the testimony of its witness, was that UGI's *pro forma* capital additions for reliability or infrastructure for its FPFTY were over $11 million, far greater than 50% of $75,400, and that

UGI's general corporate purpose expenses also far exceeded that threshold. (*Id.*) The Commission accepted that evidence and approved UGI's retention of the $75,400 for the purposes UGI stated they would be used. Thus, the Commission denied OCA's exception.

OCA now petitions this Court for review.

## III.  OCA's Appeal

OCA is challenging the Commission's interpretation of the Code and acceptance of UGI's calculations and retention of the Act 40 savings. The Commission argues its determinations are supported by the Code and the record and should be affirmed. UGI has intervened in OCA's appeal, providing argument in support of affirming the Commission's Order.[6] EAP filed an *amicus curiae* brief also providing argument in support of affirming. Before setting forth and addressing these arguments, we lay out the standards by which this Court reviews Commission decisions generally, as well as Commission decisions related to ratemaking. Further, as this matter involves statutory construction, we set forth those standards of review as well.

### A. *Standards for Reviewing Commission Decisions and Engaging in Statutory Construction*

Our standard of review of a Commission decision is limited to determining whether substantial evidence[7] supports the findings of fact, whether the Commission committed an error of law, and whether constitutional rights were

---

[6] The OSBA participated in the proceedings before the ALJs and the Commission and filed a notice of intervention in OCA's petition for review. However, due to its failure to file a timely brief, OSBA was precluded from further participation.

[7] "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support a conclusion." *McCloskey*, 127 A.3d at 866 n.16.

violated.  *McCloskey*, 127 A.3d at 866 n.16.  We defer to the Commission's interpretation of the Code and its own regulations unless the Commission's interpretations are clearly erroneous.  *Coal. for Affordable Util. Servs. & Energy Efficiency in Pa. v. Pa. Pub. Util. Comm'n*, 120 A.3d 1087, 1095 (Pa. Cmwlth. 2015).  We are not to substitute our judgment for that of the Commission "when substantial evidence supports the [Commission's] decision on a matter within the [C]ommission's expertise."  *Id.* (internal quotation marks and citation omitted).  Such "deference is even more necessary when the statutory scheme is technically complex."  *Id*. (internal quotation marks and citation omitted).  However, on issues of law, "our standard of review is de novo and our scope of review is plenary."  *Id.*

"The [Commission] has broad discretion in determining whether rates are reasonable" and "is vested with discretion to decide what factors it will consider in setting or evaluating a utility's rates."  *Popowsky*, 683 A.2d at 961.  We are not to "indulge in the processes of weighing evidence and resolving conflicting testimony."  *Popowsky v. Pa. Pub. Util. Comm'n*, 706 A.2d 1197, 1201 (Pa. 1997) (citations omitted).  Where "[t]he decision at issue[] involve[s] complex financial determinations and weighing and interpreting statistical and economic evidence, [it] is within the [Commission's] area of expertise."  *Id.*  Further, "[a]s long as there is a rational basis for the [Commission's] methodology [in establishing the rate structure], such decisions are left entirely up to the discretion of the" Commission, "which, using its expertise, is the only one which can properly determine which method is most accurate given the particular circumstances of the case and economic climate."  *Id.* (third alteration in the original) (citations omitted).  "[T]he establishment of a rate structure . . . is an administrative function peculiarly within the expertise of the [Commission]."  *Id.* (citation omitted).

17

Finally, because this matter involves statutory construction, we are guided by the principles of Section 1921 of the Statutory Construction Act of 1972, which dictate that the object of statutory construction is to ascertain and effectuate legislative intent. 1 Pa. C.S. § 1921(a). Thus, "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa. C.S. § 1921(b). "The best indication of legislative intent is the plain language of the statute." *Slippery Rock Area Sch. Dist. v. Pa. Cyber Charter Sch.*, 31 A.3d 657, 663 (Pa. 2011). We are to construe the statutory language, if possible, to give effect to all of its provisions. 1 Pa. C.S. § 1921(a). It is "[o]nly when the words of the statute are not explicit" that the court should resort to statutory construction to ascertain the legislature's intent. 1 Pa. C.S. § 1921(c).

### B. Use of the Year-End Methodology – Section 315(e) of the Code

#### 1. The Parties' Arguments

##### a. OCA's Arguments

OCA argues the Commission erred in calculating UGI's rate base using the FPFTY that included any facility that was **projected** to be in service by the end of that year for the following reasons. Section 315(e), which does not expressly set forth what methodology may be used to calculate a utility's rate base when a FPFTY is utilized, must be read consistently with Section 1301(a) of the Code, which requires that all rates be just and reasonable. OCA does not dispute that when Sections 315(e) and 1315 are read together, the use of a FPFTY permits an electric utility "to include in its rate base projected plant[s] and investments that are not used and useful on the day that rates go into effect." (OCA Brief (Br.) at 32.) But, allowing the use of the year-end methodology, rather than the average

18

rate base methodology, permits a utility to collect rates for facilities or costs **before** the facilities are operational or the costs incurred and creates a rate that is not just or reasonable in contravention of Section 1301. OCA's witnesses, along with the witnesses of I&E, explained why the year-end methodology was not an appropriate form of ratemaking because it allowed for overcollection by a utility, for which OCA contends the utility will not be held to account. This conclusion is supported by the Illinois Commerce Commission's decision in *North Shore Gas Company*, which the Commission erred in not considering. Further, while the year-end methodology was used in conjunction with a FTY, such did not result in overcollection because the FTY ended at approximately the same time the new rates became effective. Thus, the facilities projected to be in service by the end of the FTY would be in service (used and useful) when the ratepayers began to pay the new rates.

OCA further argues the Commission's decision is not based on substantial evidence, citing evidence in the record that supports the use of the average rate base methodology rather than the year-end methodology. In contrast, UGI presented no evidence to demonstrate that Act 11 and the use of the FPFTY authorized the use of the year-end methodology.

### b. The Commission's Arguments

The Commission responds that its interpretation of Section 315(e) is entitled to deference, particularly given the complexity of the Code, and should not be reversed because that interpretation is not clearly erroneous for the following reasons. The Commission's approval of the year-end methodology is supported by the plain language of Section 315(e) and the purpose of the Act 11 amendments, which was intended to encourage plant investment by mitigating, among other

19

things, the risks associated with regulatory lag. OCA's use of the average rate base methodology results in a utility being unable to recover costs for all facilities projected to be in service during the FPFTY, which is contrary to the plain language of Section 315(e). The plain language of Section 315(e) likewise does not support OCA's argument that the only way the rates calculated using the FPFTY can be just and reasonable as required by Section 1301 is to use the average rate base methodology. The General Assembly was aware of Section 1301's just and reasonable requirements when it amended Section 315(e) to allow usage of the FPFTY without the restrictions of the used and useful requirements of Section 1315 in a general rate case. Thus, including in a rate base facilities not yet in service but projected to be during the relevant time period is permitted and does not result in an unjust and unreasonable rate. As for *North Shore Gas Company*, that decision may have supported OCA's position on its face, but the Commission examined that decision and found it not to be persuasive, as is its prerogative.

In response to OCA's concerns about a utility not being accountable for its projections or collections, the Commission asserts every utility has the burden of presenting an evidentiary record that supports the additions to its rate base and why such additions are needed to provide service to its customers. The Commission does have the authority, pursuant to Section 315(e), to make after-the-fact adjustments and to require a utility to support its prior projections in a subsequent rate case. Thus, contrary to OCA's contentions, there are safeguards that the Commission may use to hold a utility to account if the use of the year-end methodology results in overearning.

### c. UGI's and EAP's Arguments

UGI and EAP both argue, like the Commission, that the use of the year-end methodology is supported by substantial evidence and the plain language and purpose of the Act 11 amendments to Section 315(e). They contend OCA's evidentiary arguments are not relevant because this issue involves a legal question and, if relevant, are merely a request for the Court to reweigh the evidence. UGI presented substantial evidence to support that its proposed rate was just and reasonable and that OCA's proposed methodology was flawed, which the Commission accepted. That evidentiary determination is not subject to appellate review.

As for OCA's legal arguments, UGI and EAP assert as follows. OCA's arguments are inconsistent with the statutory language as amended by the General Assembly via Act 11, and the Commission's interpretation of those provisions, as well as its setting of UGI's rate, are entitled to deference. The Act 11 amendments reflect the General Assembly's intent to reduce regulatory lag and support the need to replace Pennsylvania's aging utility infrastructure. By permitting a utility to use a FPFTY to meet its burden of proof in a rate case, the General Assembly authorized utilities to include, without limitation, all facilities projected to be in service **during** the FPFTY in its rate base. The use of the term "during" supports the use of the year-end methodology approved by the Commission in this matter, as does the use of that methodology to calculate a utility's rate base prior to the Act 11 amendments. OCA's average rate base methodology also allows a utility to earn returns on facilities not yet in service, but only for a portion of the FPFTY, a position not supported by Section 315(e)'s language. Although OCA raises concerns about utilities overearning through the use of the year-end methodology, utilities are not overearning when they comply with the plain language of Section

21

315(e), which authorized the use of the FPFTY and projected costs that would be incurred during that test year.

UGI, individually, argues the following. Section 315(e) does **not** speak in terms of partially projected future test years or of averaging the costs of plants projected to be in service in the test year for inclusion in the rate base, which is what OCA proposes. This methodology also eviscerates the concept of prospective rate making by designing a rate year that will recover only one-half of the total costs a utility will incur in a prospective test year. Using year-end methodology is appropriate because rates are established on an annual basis, are prospective in nature, and will be in effect for more than a year. The use of the FPFTY coupled with year-end methodology has the effect of not only reducing regulatory lag more than the average rate base methodology proposed by OCA but also reducing how frequently a utility must return to the Commission to seek an increase in its rates. OCA's arguments reflect its position that the used and useful requirement of Section 1315 should continue to be utilized, at least in part, in calculating UGI's rate base. However, the General Assembly was aware of this requirement and **exempted FPFTYs** from Section 1315, thereby choosing to **allow** rates based on facilities not yet in service but projected to be sometime during that test year. OCA's argument that rates proven under Section 315(e)'s FPFTY process are not permissible because they do not meet Section 1301's general just and reasonable requirement is not supported by the principles of statutory construction. According to UGI, OCA seeks to impose a general statutory provision (Section 1301) on a specific statutory provision (Section 315(e)), which is also the later enacted provision. Rather, Section 315(e) should be read as a refinement of Section 1301's general just and reasonable requirement. In short, if

a rate base is calculated using the FPFTY and year-end procedures authorized by the General Assembly in Section 315(e), the corresponding rate is just and reasonable.

EAP argues, individually, as follows. There is no single way to arrive at a just and reasonable rate and the methodology used by the Commission in determining a utility's rate base is a sub-determination within ratemaking that falls distinctly in the Commission's expertise. The use of the year-end methodology provides the most current and foreseeable financial information for the purpose of setting a utility's rates. According to EAP, as long as there is evidence to support the numbers used by the Commission to set a utility's rate, the Commission did not err or abuse its discretion. Using any point earlier than the end of the FPFTY would result in an understated rate base, and OCA's average rate base methodology effectively eliminates one-half of the benefits of using the FPFTY. In reviewing UGI's proposed rate base, the Commission excluded certain claimed facilities UGI projected to be in service during the FPFTY, demonstrating the Commission's exercise of its expertise in ratemaking.

### d. OCA's Reply

In its reply brief, OCA reiterates many of the arguments made in its initial brief, including that the plain language of Section 315(e) does not support the Commission's determination and that the use of its proposed average rate base methodology is the only way to ensure just and reasonable rates when a FPFTY is used. OCA contends the Commission's interpretation of Section 315(e) as allowing the use of year-end methodology is clearly erroneous and not entitled to deference because it does not give effect to Section 1301's requirement that rates must be just and reasonable. These two provisions must be read together and using

OCA's average rate base methodology harmonizes the two. Neither the mere existence of the FPFTY, nor the use of the word "during" in Section 315(e), implies the General Assembly intended that a rate base be calculated using the year-end methodology. Finally, OCA asserts that using the average rate base methodology also addresses regulatory lag when compared to the use of the HTY or FTY to set new rates.

## 2. Discussion

Due to the high level of deference this Court gives to the Commission, particularly in rate making decisions, in order to reverse the Commission's Order in this case, the Court would have to conclude that the Commission's interpretation of Section 315(e) of the Code is **clearly erroneous** and that there is **no rational basis for the Commission's methodology** in approving UGI's rate structure. *Popowsky*, 706 A.2d at 1203. Although OCA asserts the Commission's decision is not supported by substantial evidence, the question before the Court on this issue is one of law – whether the statutory language supports the use of a year-end methodology when a utility chooses to utilize a FPFTY to calculate its rate base. Reviewing the statutory language of Section 315(e), we cannot say the Commission's interpretation of that provision in this rate case is clearly erroneous. Nor can we say there is no rational basis for the Commission's approval of that methodology under the plain language of Section 315(e) and the purposes of Act 11.

Section 315(e) of the Code states, in relevant part:

In discharging its burden of proof the utility may utilize a future test year or a **[FPFTY], which shall be the 12-month period beginning with the first month that the new rates will be placed in effect after application of the full suspension period permitted under**

24

**section 1308(d) (relating to voluntary changes in rates).** . . . Whenever a utility utilizes a future test year or a [FPFTY] in any rate proceeding and such [FTY] or a [FPFTY] forms a substantive basis for the final rate determination of the [C]ommission, the utility shall provide, as specified by the [C]ommission in its final order, appropriate data evidencing the accuracy of the estimates contained in the [FTY] or a [FPFTY], and the [C]ommission may after reasonable notice and hearing, in its discretion, adjust the utility's rates on the basis of such data. **Notwithstanding section 1315 (relating to limitation on consideration of certain costs for electric utilities), the [C]ommission may permit facilities which are projected to be in service during the [FPFTY] to be included in the rate base.**

66 Pa. C.S. § 315(e) (emphasis added).

By its terms, Section 315(e) authorizes a utility to meet its burden of proof in a general rate case by using a FPFTY, which is "the 12-month period **beginning with the first month** that the new rates will be placed in effect." *Id.* (emphasis added). While ordinarily a facility must be in service to the public, or used and useful, for its associated costs to be included in a utility's rate base and the rates charged by the utility, 66 Pa. C.S. § 1315, the General Assembly granted the Commission the discretion **not to impose** this requirement for those utilities seeking to meet their burden of proof using the FPFTY. It did so by allowing a utility to include in its **rate base**, upon which customer rates are calculated, "facilities which are **projected** to be in service **during** the" FPFTY "[n]otwithstanding [S]ection 1315." 66 Pa. C.S. § 315(e) (emphasis added). Thus, under Section 315(e)'s plain language, a utility can include in its rate base, if permitted by the Commission, the costs of facilities that are not yet in service, but that are projected to be in service **during the 12-month period beginning with the first month** the new rates will be in effect. Section 315(e) does not speak in terms of averages or partially projected test years – it says facilities that are projected to be in service during the 12-month period that is statutorily defined as

25

the FPFTY can be included in the rate base.  This 12-month period includes day 1, as well as day 365.

In ascertaining and effectuating the General Assembly's intent, we are mindful that "when the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit."  1 Pa. C.S. § 1921(b).  OCA's arguments appear to urge the Court to disregard the letter of Section 315(e), which, it acknowledges, when read with Section 1315 permits a utility "to include in its rate base projected plant[s] and investments that are not used and useful on the day the rates go into effect."  (OCA's Br. at 32.)  However, it is OCA's preferred methodology that does not give effect to the plain language of Section 315(e) because it essentially redefines the key term "FPFTY" and limits the language excluding FPFTYs from Section 1315's used and useful requirement. We may not disregard the General Assembly's intent when it is clearly stated within the statutory language in question.  1 Pa. C.S. § 1921(b).  The Commission reviewed this language and concluded, within its particular expertise in the complex statutory scheme that is the Code, *Coalition for Affordable Utility Service*, 120 A.3d at 1094, that a year-end methodology could be applied to the FPFTY for UGI's rate case.  This interpretation is supported not only by Section 315(e)'s plain language, but also by the purposes of Act 11, which were to mitigate the risks of regulatory lag and to aid in the resolution of the aged and aging nature of Pennsylvania's utility infrastructure.  (Commission Decision at 23); *Final Implementation Order* at 1-3; *see also* H. 195th Sess., Oct. 4, 2011, at 1954-56; S. 196th Sess., Jan. 25, 2012, at 71-72; H. 196th Sess., Feb. 7, 2012, at 156-57.[8]

---

[8] These materials are available, respectively, at https://www.legis.state.pa.us/WU01/LI/HJ/2011/0/20111004.pdf#page=10; https://legis.state.pa.us/WU01/LI/SJ/2012/0/Sj20120125. **(Footnote continued on next page…)**

OCA once recognized that a benefit of using this methodology was the reduction in the need for future rate increases as reflected in its comments set forth in the *Final Implementation Order*, but now OCA seeks to reduce the benefit of using the FPFTY by one half, which would, ironically, require the need for future rate increases sooner. *Id.* at 3. That the Illinois Commerce Commission came to a different result in *North Shore Gas Company* under that state's statutory and ratemaking scheme does not mean the Commission erred in its interpretation of the Code's language.

We are also mindful that there is **no single way** to arrive at just and reasonable rates and that the Commission enjoys "**broad discretion** in determining whether rates are reasonable." *Popowsky*, 683 A.2d at 961 (emphasis added). While OCA claims the Commission's interpretation does not give effect to Section 1301 and results in a rate that is not just and reasonable, that provision does not require a different result. When enacting Act 11 and amending Section 315(e), the General Assembly was aware of the requirement that all rates must be just and reasonable. *Marcellus Shale Coal. v. Dep't of Envtl. Prot.*, 216 A.3d 448, 501 (Pa. Cmwlth. 2019) ("[W]hen the General Assembly enacts a statute, it is presumed to know the current state of the law."). Exercising its legislative and policy making authority, the General Assembly chose to allow, under certain circumstances, a utility to include in its rate base the costs associated with not-yet-in-service facilities, and authorized the Commission, within its discretion, to calculate the utility's rate so as to include such as-of-yet incurred costs. In allowing such costs

---

(continued…)
Pdf#page=3; and https://www.legis.state.pa.us/WU01/LI/HJ/2012/0/20120207.pdf#page=23 (last visited January 8, 2020).

to be included in the rate base, the General Assembly authorized a utility to include those costs in what it charges its customers for their utility service. Accordingly, we agree with UGI that Section 315(e) is a refinement of Section 1301 and that a rate approved by the Commission in accordance with Section 315(e) is one that is just and reasonable under both provisions.

However, both the General Assembly and the Commission were cognizant of the potential of a utility to overproject its rate base when using a FTY or FPFTY, one of OCA's main concerns in this matter.[9] Notably, all parties agree that the year-end methodology was used in the FTY process. Given the potential for overprojection, the General Assembly incorporated certain protections in Section 315(e) by authorizing the Commission to require a utility to provide the Commission with "appropriate data evidencing the accuracy of the estimates" used to calculate the rate base via either the FTY or the FPFTY and to adjust a "utility's rates on the basis of such data" after reasonable notice and a hearing. 66 Pa. C.S. § 315(e). Similarly, in its *Final Implementation Order*, the Commission advised that it "expect[ed] that in subsequent base rate cases, the utility" using the FPFTY would "be prepared to address the accuracy of the [FPFTY] projections made in its prior base rate case." *Id.* at 3. Thus, while OCA's concerns are not lightly taken, there is recourse if a utility does overproject and overcollect because there are means by which the Commission can address a utility's overprojections and any

---

[9] Moreover, while OCA's arguments could be viewed as suggesting that the Commission did not fully review UGI's projected facilities to determine whether they should be included in the rate base, which allows for improper overcollection, it is apparent the Commission reviewed the evidence to determine what facilities should be included in the FPFTY. For example, the Commission specifically excluded the proposed Operations Center from the rate base on the basis that there was insufficient evidence to support that it would be in service during the FPFTY. This exclusion reduced the rate base by over $17.3 million.

related overcollection that could occur as a result of the use of the FPFTY and year-end methodology.

For all these reasons, we cannot say that the Commission's interpretation of Section 315(e) is clearly erroneous or that its ratemaking decision lacks a rational basis such that the Commission's determinations are not entitled to deference from this Court.

### C. Use of the Act 40 Savings – Section 1301.1(b) of the Code

#### 1. The Parties' Arguments

##### a. OCA's Arguments

OCA argues the Commission erred in allowing UGI to retain the Act 40 savings because UGI failed to establish that the $75,400 was actually used or will be used in accordance with Section 1301.1(b). Beyond relying on its *pro forma* calculations, UGI presented no evidence specifically showing how or for what these funds were used: on reliability or infrastructure-related projects or general corporate purposes. Further, the Commission's interpretation of Section 1301.1(b) as not requiring a specific accounting of where or how the Act 40 savings are used does not give effect to the statutory language and renders both that subsection and subsection (c), requiring that restricted use of those savings until December 31, 2025, inoperative. For these same reasons, OCA asserts that the Commission's determination is not supported by substantial evidence. Because UGI did not meet its burden of proof under Section 1301.1(b) with substantial evidence, UGI's rate base should be reduced by $75,400.

### b. The Commission's Arguments

The Commission argues its interpretation of Section 1301.1(b) is entitled to deference as it is supported by the section's plain language and the purpose of Act 40 and, therefore, is not clearly erroneous. OCA's assertion that the Act 40 savings should be used to reduce the rate base is contrary to Section 1301.1(a)'s language and purpose, which was to eliminate the use of the CTA such that any savings a utility obtains by filing its taxes with a parent and/or affiliated companies are not used in calculating the utility's rate base. 66 Pa. C.S. § 1301.1(a). Section 1301.1(b) clearly and unambiguously sets out how a utility is to use the Act 40 savings, 50% toward capital investments relating to reliability or infrastructure and 50% toward general corporate purposes, but does not require that a utility provide specific or detailed information as to how those amounts are used. All the utility has to do is show that it is using or expending the threshold amounts in the required category, and UGI presented such evidence by establishing that its capital expenditures for reliability and infrastructure and general corporate expenditures for the FPFTY each far exceeded 50% of $75,400 UGI had in Act 40 savings. The Commission accepted this evidence as showing compliance with Section 1301.1(b), and this determination should be upheld.

### c. UGI's and EAP's Arguments

UGI and EAP argue that the Commission's interpretation of Section 1301.1(b) is supported by the plain language of that provision and the purpose of the Act 40 amendment. Act 40 was enacted to end the use of the CTA in Pennsylvania, consistent with a majority of other states, and OCA's arguments disregard the plain language of the statute and seek, essentially, to reinstate the CTA by requiring a reduction of UGI's rate base by $75,400. There is no

30

requirement in Section 1301.1(b) that UGI specifically identify or state with particularity where the Act 40 savings are used. Rather, UGI was required to, and did, establish that the Act 40 savings will be used for the designated statutory purposes.

### d. OCA's Reply

In its reply brief, OCA acknowledges Act 40 abolished the use of the CTA in ratemaking, but argues that the Commission's interpretation does not require a utility to prove that the Act 40 savings are actually used in accordance with Section 1301.1(b). OCA asserts the Commission's interpretation does not give effect to the term "use" in that section and, therefore, is not entitled to deference. Moreover, the Commission's acceptance of the *pro forma* evidence does not show how UGI used or will use the $75,400 as required by Section 1301.1(b).

### 2. Discussion

On this issue the Court is reviewing both the Commission's interpretation of Section 1301.1(b) and the Commission's determination that UGI's evidence established that its use of the Act 40 savings was or would be in accordance with Section 1301.1(b). OCA does not dispute that the General Assembly's intent in enacting Act 40 and adding Section 1301.1 to the Code was to eliminate the use of the CTA in the ratemaking process. Nor does OCA dispute that the Act 40 savings at issue are $75,400, 50% of which is $37,700. Instead, OCA challenges the Commission's reading of Section 1301.1(b) as not requiring UGI to present specific evidence of exactly how UGI actually used or will use the Act 40 savings. OCA further contends the evidence UGI presented did not show the actual use of those savings for the requisite purposes.

31

Section 1301.1(a) sets forth the treatment of certain income tax deductions and credits a public utility may have for ratemaking purposes. As acknowledged by OCA, this section eliminates the use of the CTA for ratemaking purposes and, therefore, only "the tax deductions and credits received by the public utility" and not the "deductions or credits generated by the expenses or investments of a public utility's parent or any affiliated entity" shall be included in the utility's rate base. 66 Pa. C.S. § 1301.1(a). Because the change in treatment of tax deductions and credits would result in a utility accruing additional revenues, the General Assembly placed restrictions on the use of that additional revenue until December 31, 2025. 66 Pa. C.S. § 1301.1(b), (c). That restriction requires a utility to use its Act 40 savings as follows: "(1) fifty percent to support reliability or infrastructure related to the rate-base eligible capital investment as determined by the commission; and (2) fifty percent for general corporate purposes." 66 Pa. C.S. § 1301.1(b).

In its Decision, the Commission held that the plain language of Section 1301.1(b) "**does not require** public utilities to provide **specific information** concerning how the amounts would be used." (Commission Decision at 152 (emphasis added).) While OCA contends this interpretation is inconsistent with that provision's language, reviewing the language supplied by the General Assembly, we cannot say the Commission's interpretation is clearly erroneous. Section 1301.1(b) sets forth the categories to which the Act 40 savings must be applied, but the General Assembly **did not expressly** impose any particular manner in which a utility had to establish its compliance. Instead, the General Assembly indicated that those savings had to be used to support reliability or infrastructure capital investment and general corporate purposes, but does not require an accounting of those funds. "When the words of a statute are clear and

32

free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa. C.S. § 1921(b). Even if this provision was ambiguous as to what a utility had to do to establish its compliance, because the Commission's interpretation is not clearly erroneous, it is entitled to deference. *Popowsky*, 706 A.2d at 1203.

Finally, we turn to OCA's substantial evidence challenge. The Commission is the fact finder in these matters, and we may not "indulge in the process of weighing evidence and resolving conflicting testimony." *Id.* at 1201. In performing a substantial evidence review, we must consider the record in the light most favorable to the party that prevailed before the Commission, giving that party the benefit of all inferences that can be logically drawn from the evidence. *United Transp. Union, Pa. State Legislative Bd. v. Pa. Pub. Util. Comm'n*, 68 A.3d 1026, 1032 (Pa. Cmwlth. 2013).

Here, UGI's witness Stephen F. Anzaldo testified regarding UGI's Act 40 savings and Section 1301.1(b). When asked whether UGI's rate case supported the conclusion that UGI was "using at least 50 percent of [Section 1301.1(b)'s] revenue requirement . . . to support reliability or infrastructure related to capital investment," Anzaldo stated yes, it did, because UGI's "*pro forma* capital additions for reliability or infrastructure for projects for the . . . FPFTY is $11.770 million," which was "greater than 50% of the amount of what would have been consolidated tax savings adjustment under the prior ratemaking principles." (Reproduced Record at 23a.) When asked the same question regarding the use of the Act 40 savings to support general corporate purposes, Anzaldo explained that UGI "anticipated an operating expense budget of more than $81 million" and that "50[%]of the consolidated tax adjustment revenue requirement would equate to

only $37,700." (*Id.* at 23a-24a.) Anzaldo further acknowledged that he understood Section 1301.1(b)'s requirement that the $75,400 in Act 40 savings had to be used by UGI as set forth in that provision. (*Id.* at 23a.)

Considering this testimony, accepted by the Commission, and all inferences logically drawn therefrom in favor of UGI, we cannot say that a reasonable mind would not accept it as adequate to support the conclusion that UGI's use of the Act 40 savings was or would be in accordance with Section 1301.1(b). It is a reasonable inference that UGI will use the $75,400 in Act 40 savings as mandated by Section 1301.1(b) because it is aware of that requirement and it is otherwise expending more than $11 million in capital additions related to reliability and infrastructure and has an $81 million budget for its operating expenses. Thus, there is substantial evidence to support the Commission's conclusion that UGI satisfied the requirements of Section 1301.1(b). While OCA cites to evidence disagreeing that UGI's evidence met its burden of proof under Section 1301.1(b) and explaining that UGI had not used the Act 40 savings as required, the fact that there is evidence in the record to support a contrary finding does not matter where the findings made are supported by substantial evidence. *Energy Conservation Council of Pa. v. Pub. Util. Comm'n*, 995 A.2d 465, 486 n.19 (Pa. Cmwlth. 2010).

Because the Commission's interpretation of Section 1301.1(b) is not clearly erroneous and its conclusion that UGI met its burden of proof under that provision is supported by substantial evidence, there is no basis to reverse that decision.[10]

---

[10] Moreover, we question whether the relief requested by OCA, the reduction of UGI's **rate base for ratemaking purposes** would be consistent with the plain language of Section 1301.1(a) or the purpose of Act 40. The General Assembly was clear that Act 40 savings, which reflect the former CTA, **are not** to be included in a utility's rate base. 66 Pa. C.S. § 1301.1(a) ("[T]he rate base . . . shall be based solely on the tax deductions and credits received by the **(Footnote continued on next page…)**

34

## IV. Conclusion

As the United States Supreme Court has explained, "[t]he economic judgments in rate proceedings are often hopelessly complex and do not admit of a single correct result." *Duquesne Light Company v. Barasch*, 488 U.S. 299, 314 (1989). And, in reviewing these complex matters, the Commission is given broad discretion in interpreting the Code and in setting rates. *Popowsky*, 706 A.2d at 1203. Those determinations will not be overturned unless clearly erroneous or they lack a rational basis. Because the Commission's determinations in this complex matter are consistent with Sections 315(e) and 1301.1 of the Code, and are supported, where required, by the accepted evidence, we cannot say the Commission's Decision was clearly erroneous or lacked a rational basis. Accordingly, we affirm.

_____
**RENÉE COHN JUBELIRER,** Judge

Judge Fizzano Cannon did not participate in the consideration of this matter.

---

**(continued…)**
public utility and **shall not include any deductions or credits generated by the expenses or investments of a public utility's parent or any affiliated entity**." (emphasis added)).

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Tanya J. McCloskey, Acting     :
Consumer Advocate,     :
           Petitioner     :
    :
        v.     :    No. 1549 C.D. 2018
    :
Pennsylvania Public Utility     :
Commission,     :
          Respondent     :

## **O R D E R**

**NOW**, January 15, 2020, the Order of the Pennsylvania Public Utility Commission, entered in the above-captioned matter, is **AFFIRMED**.

 

_____
**RENÉE COHN JUBELIRER,** Judge